**BIG FORK MINING COMPANY, Plaintiff-Appellant,**

v.

**TENNESSEE WATER QUALITY CONTROL BOARD, Defendant-Appellee.**

Court of Appeals of Tennessee, Middle Section.

May 15, 1981.

Permission to Appeal Denied by Supreme Court Aug. 31, 1981.

Michael W. Boehm and James Gentry, Chattanooga, and Thomas M. Donnell, Jr., Nashville, for plaintiff-appellant.

William M. Barrick, Asst. Atty. Gen., Nashville, for defendant-appellee.

Robert B. Pyle, Nashville, for Guardians of North Chickamagua Creek and Sierra Club, amicus curiae.

OPINION

CONNER, Judge.

(Filed with concurrence of participating judges).

This is an action contesting a decision of the Tennessee Division of Water Quality Control denying the plaintiff-appellant,[1] Big Fork Mining Company, a water discharge permit.

Big Fork, engaged in the business of strip mining, applied to the Tennessee Division of Water Control (hereafter division) for a National Poliutant Discharge Elimination System (NPDES) permit into the North Chickamauga Creek in conjunction with its plans to mine coal on certain property in Sequatchie County, Tennessee. After a public hearing on the matter, the division denied the permit based upon the Tennessee Anti-Degradation Statement,[2] an administrative

---

1. Hereafter, the parties will be referred to as at trial or by their names as abbreviated.

2. 1200–4–3.06 TENNESSEE ANTIDEGRADATION STATEMENT.

rule promulgated by the Tennessee Water Quality Control Board pursuant to T.C.A. § 70–328(a). The plaintiff duly sought review of the division's denial of its NPDES permit before the permit hearing panel of the Tennessee Water Quality Control Board (hereafter board). After three days of extensive hearings on July 12 and 13 and August 9, 1979, the board affirmed the division's denial of Big Fork's NPDES permit.

(1) The purpose and intent of the State in establishing Water Quality Standards and Plans as adopted are to provide for the protection of existing water quality; and/or the upgrading on "enhancement of water quality in all waters within Tennessee; and to protect the public health or welfare in accordance with the public interest." The latest edition of *Quality Criteria for Water* published by the Environmental Protection Agency pursuant to Section 304(a) of the Federal Water Pollution Control Act (Public Law 92–500), and other documents as specified by the Commissioner of the Tennessee Department of Public Health and the Water Quality Control Board shall be used as guides in determining standards of minimum water quality outside of those specifically listed in Section 1200–4–3.–02 through 1200–4–3.–05 of this document.

(2) The Criteria and Standards shall not be construed as permitting the degradation of waters whose existing quality is better than the established standards unless and until it is affirmatively demonstrated to the Tennessee Water Quality Control Board that a change is justifiable as a result of necessary economic or social development and will not interfere with or become injurious to any assigned uses made of such waters. In no case will water quality be degraded below the base levels set forth in the criteria for the protection of the reasonable and necessary uses described herein. Additionally, no degradation shall be allowed in high quality waters which constitute an outstanding National resource, such as: waters of National and State parks and wildlife refuges, and waters of exceptional recreational or ecological significance.

(3) All discharges of municipal sewage, industrial waste, or other wastes shall receive the greatest degree of effluent reduction which the Commissioner of the Department of Public Health determines to be achievable through application of stringent effluent limitations and schedules of compliance either promulgated by the Water Quality Control Board; required to implement any applicable water quality standards, including where practicable, a standard permitting no discharge of pollutants; necessary to comply with a State Water Quality Plan; or necessary to comply with other State or Federal laws or regulations.

In so doing it issued a very detailed four-page "FINAL DECISION AND ORDER," carefully delineating its "Findings of Fact and Conclusions of Law" and the basis therefor.

Plaintiff then sought review of the permit denial in Davidson County Chancery Court pursuant to T.C.A. §§ 4–5–117[3] and 70–333.[4] The chancellor allowed the Guard-

(4) In implementing the provisions of the above as they relate to interstate streams, the Commissioner of the Tennessee Department of Public Health and the Tennessee Water Quality Control Board will cooperate with the appropriate Federal Agency in order to assist in carrying out responsibilities under the Federal Water Pollution Control Act, as amended.

Authority: T.C.A. Section 70–328(a). Administrative History. Original Rule certified June 7, 1974. Rule Amended: filed December 1, 1975, effective December 30, 1975. Rule Amended: filed November 25, 1977, effective December 26, 1977.

3. *Judicial review—Petition—Interim relief—Record—New evidence—Scope of review.*—(a) A person who is aggrieved by a final decision in a contested case is entitled to judicial review under this chapter, which shall be the only available method of judicial review. A preliminary, procedural or intermediate agency action or ruling is immediately reviewable if review of the final agency decision would not provide an adequate remedy.

(b) Proceedings for review are instituted by filing a petition for review in a chancery court having jurisdiction within sixty (60) days after the entry of the agency's final order thereon. Provided further, that a person who is aggrieved by a final decision of the department of human services in a contested case may file a petition for review in the chancery court located either in the county of the official residence of the commissioner or in the county in which any one or more of the petitioners reside. The time for filing a petition for review in a court as provided in this chapter shall not be extended because of the period of time allotted for filing with the agency a petition to rehear. Copies of the petition shall be served upon the agency and all parties of record.

4. *Appeals from the board or panel—Proceedings before the courts.*—(a) An appeal may be taken from any final order or other final determination of the board or the panel by any party, including the department, who is or may be adversely affected thereby to the chancery court for Davidson County within sixty (60) days from the date such order or determination is made. No hearing, however, shall be allowed by the chancery court from any disposi-

ians of the North Chickamauga Creek and the Sierra Club to file an *amicus curiae* brief in the matter in opposition to the grant of the permit. Thereafter he affirmed its denial.

The plaintiff then perfected this appeal questioning the constitutionality of the standard upon which the division relied, the procedures followed, and the substantiality of the evidence adduced in sustaining the permit denial.

Plaintiff first attacks the Tennessee Anti-Degradation Statement, *supra*, alleging that it is "unconstitutionally vague, lacks proper standards to guide its interpretation and application is ambiguous and imprecise when measured by common understanding and practices and is thus invalid as a denial of due process in violation of Article 1, Section 8 of the Constitution of Tennessee and the 14th Amendment of the Constitution of the United States." Specifically, plaintiff asserts that the terms "high quality water" and "waters of exceptional recreational or ecological significance" are unconstitutionally vague.

 There is a presumption of the constitutionality of a statute. A non-criminal statute is not unconstitutionally vague where the statute is set out in terms that an ordinary person exercising ordinary common sense can sufficiently understand and

comply. *United States Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973). *See also Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15, *reh. denied* 417 U.S. 977, 94 S.Ct. 3187, 41 L.Ed.2d 1148 (1974).

The Tennessee Water Quality Control Act, T.C.A. § 70–324 *et seq.*, which provides for the establishment of Tennessee's water quality criteria and stream use classification for all streams, including the Tennessee Anti-Degradation Statement, is to be construed liberally to accomplish its purposes and policies. T.C.A. § 70–342(b).[5]

All the cases cited by the plaintiffs wherein the constitutionality of statutes have been successfully attacked involved either criminal or penal matters. All either forbade or required the doing of an act accompanied by some sanction for violation. See e. g., *Leech v. American Booksellers Assn. Inc.*, 582 S.W.2d 738 (Tenn.1979). The Anti-Degradation Statement neither requires nor prohibits anything. It simply sets forth a criteria to be applied by the state in the issuance of permits.

 A review of the purpose of the Water Quality Control Act (T.C.A. § 70–325[6]) reveals that this legislation is remedi-

---

tion made by the board or the panel if such disposition has become final as a result of a person's failure to appear at a hearing after having requested such hearing or after having received adequate notice.

5. *Construction of Law.*—... (b) All sections in §§ 70–324 through 70–342 shall be liberally construed for the accomplishment of its policy and purpose.

6. *Declaration of policy and purpose.*—Recognizing that the waters of Tennessee are the property of the state and are held in public trust for the use of the people of the state, it is declared to be the public policy of Tennessee that the people of Tennessee as beneficiaries of this trust, have a right to unpolluted waters. In the exercise of its public trust over the waters of the state, the government of Tennessee has an obligation to take all prudent steps to secure, protect, and preserve this right.

It is further declared that the purpose of this law is to abate existing pollution of the waters

of Tennessee, to reclaim polluted waters, to prevent the future pollution of the waters, and to plan for the future use of the waters so that the water resources of Tennessee might be used and enjoyed to the fullest extent consistent with the maintenance of unpolluted waters.

Moreover, an additional purpose of this law is to enable the state to qualify for full participation in the national pollutant discharge elimination system established under Section 402 of the Federal Water Pollution Control Act, Public Law 92–500.

Unless such national pollutant discharge elimination system permitting authority shall be granted to the State of Tennessee no later than December 31, 1977, the provisions of §§ 70–324 through 70–342 shall revert to the exact same wording as existed on April 1, 1977.

Additionally, it is intended that all procedures in this chapter shall be in conformity with the Uniform Administrative Procedures Act, chapter 5 of title 4. [Acts 1971, ch. 164, § 2; 1977, ch. 366, § 1.]

al. C.J.S. quite properly defines a remedial statute as one "designed to correct an existing law, redress an existing grievance, or introduce regulations conducive to the public good, and generally to be liberally construed." (Emphasis supplied.) 82 C.J.S. *Statutes* § 388 (1975).

We do not believe the Anti-Degradation Statement to be unconstitutional. As was well stated by the trial court in its memorandum opinion:

> The questioned regulation is a standard or criteria used in determining the issuance of a permit. Plaintiff complains about the words "high quality water" and "waters of acceptional recreational or ecological significance." These words are commonly understood when taken in connection with the context. The Court concludes the regulation is not unconstitutionally vague.

Plaintiff also challenges the permit denial saying that the decision was made upon unlawful procedure. First, the plaintiff says that the required statutory procedure was not followed when its hearing was not completed within 60 days. Plaintiff relies on T.C.A. § 70–332(a).[7] That statute says that the hearing shall be held not later than 60 days from the receipt of the written petition. The hearing began on June 12, 1979, some 58 days after receipt of the petition, and continued on June 13 and August 9. There is no requirement in the statute that such hearing be *completed* within 60 days. Commencement is sufficient absent some showing of prejudice not apparent in this record.

In addition, it is the general rule in Tennessee that "those statutory provisions which relate to the mode, or time of doing the act to which the statute applies, are not held to be mandatory, but directory only." *Trapp v. McCormick*, 175 Tenn. 1, 130 S.W.2d 122 (1939); *Lansing v. Lansing*, 53 Tenn.App. 72, 78, 378 S.W.2d 786, 789 (1963). Again this is especially true absent some showing of prejudice.

Also, as mandated by T.C.A. § 70–342(b), T.C.A. §§ 70–324—342 are to be construed liberally to accomplish the purposes of the act. Accordingly, this assignment of error is overruled.

Next, the plaintiff asserts that the burden of proof in this action was wrongfully placed upon Big Fork. In administrative proceedings, the burden of proof ordinarily rests on the one seeking relief, benefits, or privilege. 73 C.J.S. *Public Administrative Bodies and Procedure*, § 124 (1975).

Further, it is well established in Tennessee case law that the burden of proof is on the party having the affirmative of an issue, and that burden does not shift. *Pack v. Royal-Globe Insurance Co.*, 224 Tenn. 452, 457 S.W.2d 19 (1970); *Whipple v. McKew*, 166 Tenn. 31, 60 S.W.2d 1006 (1933); *Freeman v. Felts*, 208 Tenn. 201, 344 S.W.2d 550 (1961).

In *Pack v. Royal-Globe Insurance Co., supra*, the insurance company was seeking a rate increase. Thus, the court concluded that it was the party seeking affirmative relief. As such the burden was placed upon the insurance company. Here Big Fork is the party seeking relief (the discharge permit). Therefore, the burden of proof was properly placed on the plaintiff. This assignment is likewise overruled.

Finally, the plaintiffs assert that the permit denial by the board is not supported by substantial and material evidence.

In the first instance we note that the findings of the board have been held to be sufficient by the lower court. At a very minimum, this concurrent finding of fact must be given great weight by this court. *See Blue Ridge Transportation Co. v. Ham-*

---

7. *Hearings.*—Any hearing or rehearing brought before the board or the panel shall be conducted in accordance with the following:

(a) Upon receipt of a written petition from the alleged violator pursuant to this section, the commissioner shall give the petitioner thirty (30) days written notice of the time and place of the hearing, but in no case shall such hearing be held more than sixty (60) days from the receipt of the written petition, unless the commissioner and the petitioner agree to a postponement.

*mer*, 203 Tenn. 398, 313 S.W.2d 433 (1958); *C. F. Industries v. Tennessee Public Service Commission*, 599 S.W.2d 536 (Tenn.1980).

The factual issues in this case are indeed to be reviewed upon a standard of substantial and material evidence based on a consideration of the entire record, including any portion of the findings which detract from the evidence supporting the findings of the administrative body. T.C.A. § 4–5–117(h), *supra. See also Humana of Tennessee v. Tennessee Health Facilities Commission*, 551 S.W.2d 664 (Tenn.1977); *Pace v. Garbage Disposal District of Washington County*, 54 Tenn.App. 263, 390 S.W.2d 461 (1965).

The Tennessee courts have defined "substantial and material" in the context of T.C.A. § 4–5–117 as "such relevant evidence as a reasonable mind might accept to support a rational conclusion and such as to furnish a reasonably sound basis for the action under consideration." *Pace v. Garbage Disposal District of Washington County*, 390 S.W.2d at 463. In addition, the quantum of evidence must be greater than a "mere scintilla or glimmer." *Ibid.*

First, the plaintiff contends that the panel improperly considered results of a survey of North Chickamauga Creek waters made *after* the division had already denied Big Fork's discharge permit. We disagree.

The type of hearing provided by this appeal is set out in T.C.A. § 70–328(b). The statute provides:

> The panel shall hold hearings where requested by the permittee or applicant for the purpose of reviewing the denial of or imposition of terms or conditions in permits by the commissioner. *The commissioner's previous determination shall have no presumption of correctness before the panel....* (Emphasis supplied.)

In effect, this is a *de novo* hearing. In a *de novo* hearing, the board to which the appeal is addressed does not review the action of the lower tribunal and is not concerned with what took place below. Further, no presumption of correctness attaches to the correctness of the action of

the previous body. *Hohenberg Brothers Co. v. Missouri Pacific Railway Co.*, 586 S.W.2d 117, 119 (Tenn.App.1979).

It is also the general law that evidence other than that offered before the administrative body is admissible before a tribunal which tries the matter *de novo*. 73 C.J.S. *Public Administrative Bodies and Procedure*, § 204 (1975).

Further, this survey as to which Big Fork complains had been planned for some time by the Tennessee Water Quality Control Board and was not conducted specifically for this action. Nor was this survey the only factual evidence before the board. Surely any competent evidence, at whatever time compiled, which would help the trier of fact in reaching a correct determination is timely and proper for consideration. Thus, the state's additional evidence was properly considered before the board.

Plaintiff's second concern with the evidence presented at the hearings is that it was composed of opinions not based upon facts, but opinions as to the "ultimate issue." Plaintiff is correct that expert evidence in the nature of conclusions is to be given little weight by an administrative tribunal unless it is supported by factual data. 2 Am.Jur.2d *Administrative Law*, § 395 (1962). However, the opinions of qualified experts constitute valid evidence and may support a decision of an administrative tribunal. It is for the trier of fact to determine the weight to be given to the testimony. *Ibid.* This was an administrative proceeding and not a court proceeding. Accordingly, strict rules of evidence do not apply.

Was the evidence presented to the board "substantial and material?" We hereafter highlight portions of the proof.

Ann Farmer, a biologist with the division in the Chattanooga basin office, testified concerning her study conducted in June, 1979. The water quality survey conducted by Ms. Farmer sampled ten different locations on North Chickamauga Creek for chemical, biological, and recreational re-

source data during a 12-day period. The results of her survey, upon which Ms. Farmer based her conclusion that North Chickamauga Creek was a stream of exceptional recreational or ecological significance, were:

North Chickamauga Creek is affected by acid drainage and supports aquatic life and contact recreation at an extremely critical borderline basis. The geology of the watershed is such that the waters in the stream flow over and through sandstone and shale producing little or no buffering materials such as carbonates and phosphates, etc. Thus, the stream waters are naturally soft and low in pH as a result of the natural dissolution of $CO_2$ from the atmosphere and animal and plant respiration. The natural pH range being from 5.0 to 5.5 units. Consequently, very little volume of acid drainage from disturbed areas with a pH of 2.0 to 3.0 were documented as bringing the flowing waters of North Chickamauga Creek pH down to 3.4.

The reactiveness of an acid upon tissue is a function of its concentration in solution and not necessarily related to the actual hydrogen ion concentration or measurement of pH. Thus, corresiveness (sic) of acid is dependent upon the normality of that acid or the volume of the acid in solution. While the measurement of pH is not necessarily an indication of an acid water's dehydration or burning nature upon tissue, it can be used as an indicator of the ability to interfere with physiological processes of living tissue. Such processes as osmosis, hormonal cycles, toxicity of other materials and diffusion of oxygen are affected by hydrogen or hydroxyl ion concentrations of the surrounding solutions. *With a naturally acidic pH regime and low buffer capacity, the addition of comparatively small volumes of acid drainage can cause a significant depression of pH. Any further depression of pH by only two or three-tenths of a unit will result in the elimination of the majority of the aquatic life and safe recreational use in North Chickamauga Creek.* (Emphasis supplied.)

Essentially, if this testimony is believed, North Chickamauga Creek is "fragile" in the terminology of Hudson Nichols, Chief of the Tennessee Wildlife Resources Agency Fish Management Division, and cannot take more pollution.

Steve Anderson, assistant director of the division's department of enforcement and planning, explained why he made the decision to deny the permit to Big Fork. He testified:

Alright, we went into this public hearing with an open mind. At that public hearing, it was demonstrated by several parties, both of the public and Tennessee Wildlife Resources Agency that: (1) the stream was of unusual quality for an urban stream and that it was a trout stream, which is very unusual. It is the only trout stream I'm aware of in the four major metropolitan areas. That made it unique. The fact that it was used for canoeing, swimming, bank fishing, these types of activities; that was demonstrated at the hearing. That added to my opinion that it was unique.

Comments were made about the fisheries in the stream, trout fisheries, and comments I think about small mouth bass; these types of things which is (sic) indeed in my mind, an engineer's mind, unusual for a metropolitan stream. So what the testimony told me was that this stream was unique, that it was used heavily for recreation in an unusual manner; it was unusually ecologically significant. The fisheries there were of quite good quality so it told me that this was an exceptional stream.

Now, what it additionally told me was that the stream had received pollution from several sources through the years; particularly in the viewpoint of Tennessee Wildlife Resources Agency the fisheries were at the point where they could accept no additional pollution. So, that told me that the stream could receive no additional degradation.

That having been basically my conclusions of what came up to the hearing, it became quite obvious to me as I'm very

familiar with our water quality standards, that the Tennessee Anti-Degradation Statement was an appropriate consideration in the permit issuance. We looked at it in-house; we discussed and I asked the technical staff can you assure me that there will be no degradation if this permit is issued. And I was speaking to their permit limitations and the staff could not provide that assurance to my satisfaction and therefore, it became my determination that the permit should be denied.

Garey Mabry, a professional engineer who is chief of the mining section for the division, explained how he determined that there would be additional degradation in the stream if the Big Fork permit were granted.

> ... In this case we're talking about a stream with a fairly limited drainage area. Therefore, we have very little water, relatively speaking, that the discharge is going into. We also have a lot of statements that this is a high quality stream. And water clarity is an important consideration of people using and enjoying the stream.

> Since, in my opinion, in the higher rainfall events the suspended solids limits will inherently in this type stream, due to the type of treatment proposed, be exceeded; it was my opinion that the discharge entering the stream would be of much higher suspended solids than the stream itself. Therefore increasing the *trepidity* of the water, in effect, we have muddy water entering the stream. Therefore, by the rules and the law, that's degradation of that stream. (Emphasis in the original.)

Mr. Mabry's opinion was formed as the result of two meetings. The first meeting was with members of the division and two representatives of the Tennessee Wildlife Resources Agency.

A. ... And at that meeting we discussed the concerns TWRA had concerning mining in this watershed and their concerns about North Chickamauga Creek in general.

Q. (by Gary Simpson, Water Quality Control staff attorney) Did they provide technical data to you at that time?

A. They provided us with their in-the-field observations of the conditions and qualities existing in the creek. They also spoke of some of their on-site investigations of other mine areas.

The second meeting referred to by Mr. Mabry was a public hearing attended by various environmental groups and Tennessee Wildlife Resources Agency (TWRA) members. He testified as to the comments made by the individuals at the hearing:

A. The comments that they [Sierra Club and Guardians of North Chickamauga Creek] made related to the issuance of the permit. Both groups were opposed to the issuance of the permit and mining in the watershed. They expressed concern over the fragile nature of the stream and how this proposed mining operation would impact their uses; namely fishing, swimming, boating, and the aesthetic enjoyment of the stream.

Q. (by Mr. Simpson) Do you recall what comments were made by TWRA, the general nature of those comments?

A. TWRA spoke to their trout stocking program in the stream and to the fact that, in their opinion, the stream was in a delicate balance, that some degradation had already occurred and that their trout stocking program was, I believe they described it as marginal. They expressed their concern that additional mining in this watershed would have negative impacts upon their trout stocking program.

Q. As a result of hearing comments made by these groups, what was your state of mind after that hearing?

A. Well, we considered, before I really started making up my mind, we allowed the ten days to elapse. Then we reevaluated the comments that

were received at the hearing and the comments we received in the ten day period. I was made aware that the recreational uses that were being made of the stream. I became aware of the possible impacts that mining and the discharge from the mining site might have on these uses.

Anders Myhr, a Regional Fisheries Biologist for the Tennessee Wildlife Resources Agency, testified:

It's a critical balance in my professional opinion. We may actually lose the entire stream.... [T]he arm of North Chickamauga Creek in which the permit (is) involved can stand very little, if any, more stream degradation as far as siltation, or anything ... of that nature.

Mr. Myhr, who like the rest of the experts who testified in opposition to the permit has impressive educational credentials, has spent approximately 1200 hours of his professional time in the North Chickamauga Creek watershed since 1972, plus numerous additional hours of recreational time on the creek.

In the last analysis the evidence recited herein and other evidence in this lengthy record was more than sufficient to meet the "substantial and material test." The proof adduced at full and fair hearings clearly showed that if the permit issued great harm might befall the North Chickamauga Creek. This is without doubt one of lower East Tennessee's last remaining fresh water streams, such as was intended to be protected by the Tennessee Water Quality Control Act.

As eloquently stated by counsel in the *amicus curiae* brief:

North Chickamauga Creek is a quiet stream located partly within the city limits of the city of Chattanooga, Tennessee. The upper reaches of the stream start high atop Walden's Ridge and for the first 15 miles the stream is characterized by tumbling mountain brooks culminating within a large gorge as a stream with alternating pools and small waterfalls. After leaving the mountains, North Chickamauga Creek becomes a pastoral stream with an old mill, swimming holes, oxbows, and meanders. The tree canopy provides excellent shelter for the fish and wildlife that live in and along the pools and riffles. The last three miles of the stream, prior to its confluence with the Tennessee River, possess the characteristics of a tidal stream due to fluctuations in nearby impoundments.

North Chickamauga Creek's unique integrity and water quality for an urban stream have survived man's many abuses as the city of Chattanooga has expanded into and beyond its lower watershed. Insults from prior mining activities have placed the stream on the brink. Further mining in the watershed could spell the end of Hamilton County's last remaining trout stream.

■ We well recognize the need to balance environmental and ecological considerations against the basic rights of entrepreneurs in a free enterprise system in their efforts to produce a product which will meet the physical needs of the people. However, in this instance we are satisfied that the board fairly considered the conflicting interests involved and reached a proper result based upon the law and evidence before it. Our judgment should not be substituted for that of the board.

Accordingly, we affirm the holding of the chancery court sustaining the action of the board. The cause is remanded and the costs of this appeal are taxed to the plaintiffs.

AFFIRMED AND REMANDED.

TODD, P. J., and CANTRELL, J., concur.