IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 3, 2016 Session

**STRATFORD HALL HOME OWNERS' ASSOCIATION
v. ROGER G. HALEY**

**Appeal from the Chancery Court for Rutherford County
No. 14CV679    Mitchell Keith Siskin, Chancellor**

_____

**No. M2015-01948-COA-R3-CV –Filed September 16, 2016**
_____

Homeowners' association brought suit against homeowner who refused to paint his home as requested.  After a bench trial, the court determined that the board of the homeowners' association had properly exercised its discretion and ordered homeowner to paint his house.  Homeowner appeals, contending that the appearance of his home was consistent with the appearance of homes and the common areas of the subdivision.  Upon our *de novo* review, we have determined that the board had authority under the bylaws governing the association and the subdivision's covenants to require the homeowner to paint his home, and that the board's action was appropriate.  Accordingly, we affirm the judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, and NEAL W. MCBRAYER, JJ., joined.

Thomas L. Reed, Murfreesboro, Tennessee, for the appellant, Roger Haley.

Caleb B. McCain, Franklin, Tennessee; and Brad W. Hornsby, Murfreesboro, Tennessee, for the appellee, Stratford Hall Home Owners' Association.

**OPINION**

**I. FACTUAL AND PROCEDURAL HISTORY**

This appeal involves the enforcement of restrictive covenants in the Murfreesboro, Tennessee, subdivision of Stratford Hall.  The restrictions and covenants are set forth in the

"Declaration of Covenants, Conditions, and Restrictions for Stratford Hall" ("the declaration"), which incorporate by reference the By-laws of Stratford Hall Homeowners' Association, Inc. ("the bylaws").[1] The affairs of the homeowners' association are managed by its board members ("the board"), pursuant to the declaration and bylaws.

The board sent a request in August 2011 to Stratford Hall resident Roger Haley, asking him to repaint his house, which had been constructed in 2001 with HardiePlank, a brand name for a cement-fiber based siding material. Mr. Haley initially refused the request; after the board made additional requests, he agreed to paint his home but subsequently changed his mind.

On May 7, 2014, the board filed suit in Rutherford County Chancery Court, asking the court to require Mr. Haley to repaint his home, or alternatively, to allow the board to access Mr. Haley's property to paint the home and be reimbursed for the work. The board also sought a judgment for Mr. Haley's unpaid association fines and charges, as well as attorney's fees and costs. Mr. Haley answered, admitting that he had ignored the board's requests that he paint the exterior of his house; he denied that the painting was necessary. Mr. Haley asserted several affirmative defenses, including that he had complied with "all lawful requests of the Plaintiff" and that the board's actions "are arbitrary, capricious, and exceed the authority of the board." Trial was held in July 2015.

The trial court issued a "Letter Opinion" on August 14, which was incorporated into the final order, entered on September 1, 2015, holding that Mr. Haley was required to repaint his home within 60 days of the order becoming final. The order denied the association's request for a $920 judgment against Mr. Haley for fines levied against him as well as for attorney's fees. Mr. Haley appeals, articulating the following issues for our review:

1. Whether the court erred in going outside the pleadings and proof.
2. Whether the trial court erred in placing the burden of proof on the defendant.
3. Whether the trial court erred in finding the actions of the HOA Board constituted adoption and publication of a rule.

## II. STANDARD OF REVIEW

Our review of this non-jury case is "*de novo*, with a presumption of correctness as to the Trial Court's findings of fact balanced against the preponderance of evidence in the record, with great weight accorded the Trial Court's findings of credibility of witnesses"; the court's "conclusions of law are subject to *de novo* review." *Apollo Shores Cmty. & Maint., Inc. v. Lynn*, No. E1999-00946-COA-R3-CV, 2000 WL 796126, at *2 (Tenn. Ct. App. June

---

[1] The declaration was made effective on April 23, 1999 by Scottland Chase Venture, the developer; the bylaws were signed by the Chairman on August 14, 2000.

21, 2000) *(citing Quarles v. Shoemaker,* 978 S.W.2d 551, 552-553 (Tenn. Ct. App.1998); *Campbell v. Florida Steel Corp.,* 919 S.W.2d 26, 35 (Tenn. 1996)).

## III. ANALYSIS

Consistent with our standard of review, we examine the record to determine whether the board had the authority to act as it did and whether the proof supports its action. Neither party contests the validity of the declaration and bylaws or that Mr. Haley's property is subject to them. We review the declaration and the application to the facts of this case *de novo* because "[t]he construction of restrictive covenants, like other written contracts, is a question of law." *Hughes v. New Life Dev. Corp.,* 387 S.W.3d 453, 480-81 (Tenn. 2012). Similarly, we review the interpretation of the bylaws as a question of law.

Pertinent to this appeal, Article IV of the declaration sets forth the association's and owners' responsibilities relating to maintenance:

> Section 1. Association's Responsibility. *The Association shall maintain and keep in good repair the Common Area shown on the plat of the development including, but not limited to, parks, alleyways, streets, street lights, sidewalks, and the main entrance gate.*
>
> The Association shall be responsible for additional maintenance which shall include cutting grass and edging to the garage of each unit though same are not part of the Common Area.[2] The Association shall, as well, be responsible for the maintenance of front yards of each unit even though same are not part of the Common Area. This maintenance shall include cutting of grass, edging, weeding, fertilizing, and pest control for both Townhomes[3] and Cottage Home[4] lots; such maintenance to be funded as hereinafter

---

[2] In Article I, Section 5, "Common Area" is defined as

"the Properties and any improvements thereto, but excluding Residential Units and components thereof and easements appurtenant thereto, now or hereafter owned by the Association for the common use and enjoyment of the Owners, including, but not limited to, any and all streets, roads, alleyways, bridges, parking areas, lakes, waterways, fences, structures, sidewalks, curbs, signs, lights, common utilities, and other improvements, which Common Area shall be conveyed to the Association."

In a separate section, "Properties" is defined as "the real property described in Exhibit 'A'"; that exhibit contains a metes and bounds description of Stratford Hall, Section I.

[3] "Townhomes" is defined in Article I as "single family housing structures which are attached to other single family townhome structures."

3

provided. Additionally, the Association shall be responsible to maintain, repair, and replace, subject to any insurance then in effect, all trees, landscaping and other flora, structures, storm water control, as well as any improvements situated upon the Common Area. . . .

> As to Lots 6 through 17 ("Townhouse Lots") and any lots annexed thereto, maintenance shall in addition include maintenance, repair and replacement of roofs; maintenance and painting of exterior walls and trim; and fire and hazard insurance.

> Section 2. Owner's Responsibility. In accordance with this Declaration and Subsequent Amendments to this Declaration, and except as provided in Article VIII, and except as provided in Article IV, Section 1 above, *all maintenance of the exterior* and interior *portions of the Residential Unit*[5]; land, flora, and landscaping with thin the boundaries of a Unit; those areas within enclosed patios, or courtyards; *all inside and outside wall, roofs, and structural components of the Residential Unit*; all patios, decks, balconies, and driveways serving only one Residential Unit; *and other improvements not maintained by the Association shall be the sole responsibility of the Owner thereof, who shall maintain said portions of the Residential Unit in a manner consistent with the Community-Wide Standard, the applicable covenants set forth herein, and such rules and regulations as may be established by the Board of Directors from time to time.*

(Emphasis added.) "Community-Wide Standard" is defined in Article I, section 9, as "the standard of conduct, maintenance, or other activity generally prevailing in the subdivision."

Article VIII, section 6, of the declaration gives the board authority to make and enforce reasonable rules and regulations governing the use of the Properties, "which rules and regulations shall be consistent with the rights and duties established by this Declarant." In addition, that section grants the board the authority "to seek relief in any court for violations or to abate nuisances." In Article XI, "Use Restrictions," the declaration provides that each owner "shall maintain[] the exterior and interior of his Residential Unit . . . in a clean, sanitary, and attractive condition" and grants the board "the right of inspection and entry in order to perform the duties and obligations of the board under this Declaration and

---

[4] "Cottage Home" is defined in Article I as an "independently owned structure on a separate lot."

[5] "Residential Unit" or "Unit" is defined in Section 17 of Article I as "a portion of the Properties intended for any type of independent ownership for use and occupancy as a residence by a single family, which shall mean units for both Townhomes and Cottage Homes, whether a residence is constructed thereon or not. All Residential Units shall be shown and identified as numbered lots or units upon the Plat."

under the Bylaws" as well as to "establish procedures and policies for inspection of Units and enforcement of existing requirements."

Pertinent provisions of the bylaws are located at Article Eight, Section 2(b)(vii) of which vests the board with the duty to "cause the exteriors of the dwellings to be maintained as set forth in the Declaration," and Article Eleven, "Obligations of the Owners," which states:

> SECTION 2. Maintenance and Repair:
> (a)Except as may be provided in the Declaration, every owner must perform promptly at his or her own expense all maintenance and repair work within their unit and lot, which, if omitted, would affect the project in its entirety or any part belonging to another person."

> ***

> SECTION 4. Compliance:
> (a) Each owner shall comply strictly with the provisions of the Declaration.
> (b) Each owner shall always endeavor to observe and promote the cooperative purposes for the accomplishment of which Stratford Hall was built.

Construed together, these provisions of the declaration and bylaws set forth the responsibility of an owner relative to the maintenance of the home and vests the board with responsibility for inspecting homes and enforcing the requirements that homes be kept in an attractive condition and in accordance with the community-wide standard. The board was therefore acting within its authority by inspecting Mr. Haley's home to determine whether it met the community-wide standard.[6]

Having concluded that the board had the authority, we now examine whether the proof established that the condition of Mr. Haley's home warranted the action taken by the board. The trial court did not make a specific finding that Mr. Haley's home failed to meet the applicable community-wide standard or that it was not maintained in an attractive condition.

---

[6] In his third issue, Mr. Haley contends that the court erred when it held that "the Board has established a rule requiring homeowners to repaint their homes from time to time, when needed to maintain the home in an 'attractive condition,' as required by Article XI, Section 1(b) of the Declarations." We agree that there is no evidence to support this holding. Under the declaration, however, no rule was needed because the declaration itself, in Articles IV and XI, sets forth the responsibility of the owner to maintain the interior and exterior of the unit, and Article XI, as well as Article VIII of the bylaws gave the board the authority to require homeowners to perform maintenance on their homes.

5

In the absence of such a finding, we may search the record to determine where the preponderance of the evidence lies, *Gooding v. Gooding*, 477 S.W.3d 774, 783 (Tenn. Ct. App. 2015), which we proceed to do.

In its case in chief, the board called as witnesses Mr. Haley and board members Claudia Hunter, Robert McCloy, and Robert Doudican. Mr. Haley testified that construction of his home was completed in 2001 and that the board first contacted him in August 2011 about painting the house; that he received a letter from the board in March 2012, referencing the "attractive condition" requirement at Article XI of the declaration and the "community-wide standard" of Article Eleven of the bylaws, and informing him that he needed to repair and repaint the dormers; and that his home "needs to have repairs made and then the entire exterior and trim of the home needs to be completely repainted."

Ms. Hunter testified that she serves as the board's president and explained the board's process for determining which houses needed maintenance. She testified that the board receives a report twice per year that is submitted by "two or three persons" who drive through the community and identify homes needing maintenance; that the board members then look at the homes for themselves, and at the next board meeting, discuss those homes and come to an agreement as to which ones need maintenance; that on average, 20 letters are sent per year to homeowners requesting that they perform some maintenance on their home. She testified that the purpose of the process "is to keep property values up to the level they are"; that the decision to ask Mr. Haley to paint his house was reached after going through the process; and that there was no deviation from the process in dealing with Mr. Haley. She also testified that she drives past Mr. Haley's home daily; that "the west side [of Mr. Haley's house] looks pretty bad"; and that the need for maintenance on his home "persist[ed] despite some of [Mr. Haley's] actions" to clean, paint, and repair portions of the house.

Mr. McCloy testified that the Board's measure of what homes needed maintenance was to "compar[e] with other homes and also just understanding what is wear and tear and what is not." Mr. Doudican testified that the paint on Mr. Haley's house "has faded sufficiently to need repainting."

Through these witnesses, the board also introduced photographs of Mr. Haley's home showing chipped and peeling paint on the trim, siding, and brick, as well as dirt and mildew; the board also introduced photos of several other homes in the neighborhood, as well as photographs of a mulched playground with a clean, white fence. On cross examination of the above witnesses, Mr. Haley introduced photographs of lampposts, the entrance gate, the fountain, the playground, a developer's sign, the well house, an unpaved alleyway and street, a column in a landscaping feature, a broken curb, an uncovered valve, two stumps in a landscaped bed, and several dead shrubs, all located in common areas maintained by the board.

6

As his proof, Mr. Haley testified, followed by Charles Farrer, John Carroll, and David Gray. Mr. Haley testified that the board had made maintenance requests of him in the past, including pruning trees, painting the mailbox, and having the dormers and trim painted; he complied with these maintenance requests because he thought they were reasonable. He testified that when the board asked him to paint his home in August 2011, he first said it was not necessary, then upon the board's continued communications he agreed; he changed his mind again after asking Mr. Farrer, who had "a good reputation in being able to evaluate conditions," to inspect his home, and after considering Mr. Farrer's opinion. Mr. Haley testified further that he decided he did not want to begin a "maintenance cycle" of painting and that he touched up the paint in places and at the time of trial, "in [his] opinion, it looks fine. It looks great." He introduced photographs of the house with the maintenance he had performed on the trim work, as well as close-up photos of his home with a sample of the paint color held in front of it to show that his current paint "matched perfectly" with the sample. He testified that he "thinks [his] home is maintained better than the common areas."

On cross examination, Mr. Haley admitted that during the multi-day break in the trial, he "saw the spot that [the board] had taken a picture of, that I hadn't seen before"; and that the photos prompted him to perform some maintenance on his home. He also testified that the overall acreage of Stratford Hall is "between 80 and 95 acres," with the common area occupying "approximately 21 acres." He also testified that he did not contact the board to report the maintenance issues he had observed in the common areas. During cross examination, the board introduced pictures showing other homes in the subdivision, landscaping features, the playground, labyrinth, fountain, and entrance to Stratford Hall.

Mr. Haley then called three witnesses, all of whom had some property management or construction knowledge. Mr. Farrer, who owns a restoration/construction company as well as residential and commercial real estate, testified that when he examined the paint on Mr. Haley's home "about two years [prior to trial in July 2015]," "[i]t was chalking a little bit," which "is just a normal process of paint" and suggested Mr. Haley wash the home to remove the chalking. When he viewed the home three to four weeks prior to testifying, he again found "just a little bit of chalking."

Mr. Carroll, who identified himself as "a general friend" of Mr. Haley's and who was the previous sales manager for a home builder in Stratford Hall, testified that he did not observe "any chipping, flaking, any discoloration . . . [Mr. Haley's house] was uniform on all four sides," except for "one small side . . . [where] a minor, minor amount of chalking on your fingers [was found]." Mr. Carroll testified that the siding "[a]ppeared to be performing in extraordinary shape in my opinion . . . certainly, at some point down the road it's going to need to be painted." Mr. Carroll also echoed Mr. Haley's sentiments about the maintenance of a couple of places in the common areas and that he thought "Mr. Haley's home is far superior to the common area overall maintenance."

7

Mr. Gray, a resident of Stratford Hall and friend of Mr. Haley, who was formerly responsible for maintenance of the grounds, motor pool, power plant, and construction projects at Middle Tennessee State University, testified that he did not think Mr. Haley's home needed repainting; that he did not see any chalking on Mr. Haley's house but didn't view all of the house; and that the house "exceeds the standards" of the maintenance of the common area.

In rebuttal, the board called Claudia Hunter, board member Jerry Allen, and residential home builder Gary Wisniewski.

Ms. Hunter testified that the Board had addressed the common areas by resurfacing the playground with mulch and power-washing and cleaning its fence; painting the well house; calling the gate company to address some protruding wires; and having the developer's sign painted. She testified that the board had been discussing the fountain for months and trying to get a contractor to examine the fountain and quote a price for repairing the hardscape around it, so they could decide whether to replace it all together; this would have to be voted on by the homeowners, since "it will be a big capital expense." She also testified that the board had discussed the shrubs that needed replacing with the landscaping company, the entity responsible for removing and replanting them when appropriate.

Jerry Allen, treasurer of the board, testified that he took the pictures of the maintenance issues identified on Mr. Haley's home as well as the photos of various vantage points in Stratford Hall, which Mr. Allen testified represented the general appearance of the subdivision on a day-to-day basis.

Gary Wisniewski, a contractor of homes in Stratford Hall, as well as a remodeler and land developer, testified that he has been using HardiePlank for 12 years; that he examined Mr. Haley's home two hours prior to testifying and concluded that the HardiePlank is "tired" and "needs to be recaulked" and that the paint is "faded and starting to look a little chalky" but the "wood and all around the trim, the windows, looked in decent shape." He also testified that "a paint job on Hardie will last five to seven years."

From the foregoing, it appears that Mr. Haley's home is in need of the maintenance and repair required by the board; his home had not been painted in the 14 years following its construction and, in addition, was in need of repair. The appearance of his home was below that of other homes in the subdivision. This is true, notwithstanding his testimony that "[his] home is maintained better than the common areas" and reliance on photographs showing deficiencies in the maintenance of common areas. The photographs show a subdivision of well-maintained homes and common areas contrasted with Mr. Haley's "tired" paint and outside areas which were in need of repair. To the extent probative of any issue, several of the unsightly parts of the common area cited by Mr. Haley had been remedied by the board before or during the course of trial, and other parts, like the fountain and the few dead or

8

dying shrubs, had been the subject of board action in the past and, according to the board members, would continue to be in the future. In light of the proof before us as to the maintenance of the common areas and the other homes in the subdivision as a whole, Mr. Haley's home failed to meet the community-wide standard.

Upon this finding, we conclude that the board properly exercised its authority to issue a request to Mr. Haley to maintain his home in compliance with the declaration and the bylaws and his failure to comply was a violation of the declaration and bylaws.

**Remaining Issue**

Mr. Haley contends that "the trial court erred in placing the burden of proof on him"; the particular ruling is as follows:

> Essentially, what has happened in the Stratford Hall community is that the HOA has assumed the duties of the never-formed Architectural Control Committee,[7] but no specific guidelines have ever been reduced to writing regarding the criteria to be applied by the HOA in determining which homes are in need of repairs in order to maintain their "attractive condition." The law does not, however, require that restrictive covenants be specific in their criteria. *Avalon Sections 4, 6, and 7 Homeowners Association v. Chaudhuri, et al.,* [No. M2013-02346-COA-R3CV,] 2014 WL 2949458 at *7 (Tenn. [Ct.] App. 2014), perm. app. denied 10/20/14. When restrictive covenants establish a review committee but do not contain specific criteria for the committee to follow, the validity of the criteria and the committee's interpretation of the criteria will be judged by a standard of reasonableness. See *Id.* at *6. The burden of proof is on the homeowner to show that the HOA acted unreasonably or without good faith. *Id.* at *7.
>
> ***
>
> Considering all of the evidence in this case, I find that Mr. Haley has not carried his burden of proof in showing that the Board has acted

---

[7] The footnote in the trial court's ruling read as follows:

Article IX of the By-Laws states that the HOA shall appoint an "Architectural Control Committee," which was apparently never done. Nonetheless, Article VIII, Section 6 of the Declarations vests the HOA, "through its Board of Directors or otherwise" with the authority to "make and enforce reasonable rules and regulations governing the use of the Properties." Therefore, in the absence of an Architectural Control Committee, the Board has the authority to act in its stead.

unreasonably or without good faith. *See* <u>Avalon</u>, *supra*, at \*7. There has been no proof of selective enforcement against Mr. Haley, and although reasonable people can have different aesthetic opinions as to whether Mr. Haley's home needs repainting, the Board has not treated Mr. Haley any differently than any other homeowner, and has properly exercised the discretionary authority granted to it under the Declarations and By-Laws.

We agree with Mr. Haley that there was no evidence in the record to support the court's finding that the board had acted as the Architectural Control Committee. While an "Architectural Control Committee" is not mentioned in Stratford Hall's declaration, it does provide that "[t]he Board may designate a site and architectural review board (the "SARB") to exercise its authority under this article." Article X, "Architectural Standards," in which this provision is found, deals with construction, improvements, modifications, additions, or alterations to completed Residential Units. Given the nature of the request at issue (i.e., that Mr. Haley repaint his home rather than a request from Mr. Haley to build an addition or modify his home), the site and architectural review board ("SARB"), or the board acting in its stead, would not have become involved. Thus, despite the trial court's holding to the contrary, any provisions of the declaration relating to the SARB are inapplicable to the matter before us and do not impact our interpretation of the declaration and bylaws and their application to the facts in this case.[8] Thus, the trial court's reliance on *Avalon* is misplaced, as that case is not on all fours with the facts of the case at bar. We therefore disagree with the court's decision to apply the holding of that case to the facts of this one.

The board established in its case in chief, primarily through the testimony of the board members, that it acted reasonably and with good faith in making its request of Mr. Haley; we agree with the trial court's finding that "there has been no proof of selective enforcement against Mr. Haley." Upon the close of the board's proof, Mr. Haley was then able to rebut the proof. Though he stated that the board's request that he paint his home was unreasonable, he presented no proof showing that the board was unreasonable, only contradictory proof as to the urgency of the need for painting.

Also, Mr. Haley pled in his answer, as an affirmative defense, that the board's "actions in ordering the defendant to paint his house are arbitrary, capricious, and exceed the

---

[8] We note that the bylaws for Stratford Hall were filed as an exhibit to the complaint, but the bylaws for a different development, Stratford Place, were filed as an exhibit at trial, along with amendments to Stratford Hall's bylaws, none of which are applicable to the case at bar. The sets of bylaws contain identical provisions referencing an "Architectural Control Committee" at Article IX of the Stratford Place bylaws and Article Thirteen of the Stratford Hall bylaws. The court's order references Article IX of the bylaws, which shows that it relied upon the Stratford Place bylaws in reaching its decision, not the Stratford Hall bylaws. Mr. Haley notes this in his brief on appeal, but raises no issue relating to the discrepancy. Given their similarity, the discrepancy is without distinction and does not impact our analysis in this case, as we have concluded that the situation did not warrant the involvement of the SARB or Architectural Control Committee.

10

authority of the board." It was therefore his burden to establish that the board acted in the way he alleged. *See Big Fork Min. Co. v. Tennessee Water Quality Control Bd.*, 620 S.W.2d 515, 520 (Tenn. Ct. App. 1981) (stating that "[t]he burden of proof is on the party having the affirmative of an issue"). He did not, and thus the second issue Mr. Haley raises is without merit.

## IV. CONCLUSION

On the grounds stated in this opinion, we affirm the judgment of the trial court ordering Mr. Haley to repaint his home.

RICHARD H. DINKINS, JUDGE