**PERLMAN/ROCQUE, Appellant,**

v.

**REVIEW BOARD OF the INDIANA DEPARTMENT OF WORKFORCE DEVELOPMENT and Julie K. Seely, Appellees.**

No. 93A02–9407–EX–429.

Court of Appeals of Indiana,
Fourth District.

May 4, 1995.

Ronald R. Pritzke, Karin L. Blue, Pritzke & Davis, Greenfield, for appellant.

Pamela Carter, Atty. Gen., Sabra A. Weliever, Deputy Atty. Gen., Indianapolis, for appellees.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Perlman–Rocque appeals a decision of the Review Board of the Indiana Department of Workforce Development awarding unemployment benefits to claimant Julie Seely on the grounds that she was discharged without just cause. We affirm.

### ISSUES

I. Did the Review Board properly find that Seely was discharged without just cause?

II. Did the Review Board violate Perlman's due process rights?

### FACTS

Perlman–Rocque, located in Greenfield, Indiana, is a distributor of McDonald's products. Julie Seely was employed by Perlman as an Order Loader Selector from August 14, 1987 through July 16, 1993. In that capacity, Seely selected items ordered by McDonald's, and loaded the items onto delivery trucks. One of the items that Seely was responsible for loading was frozen beef patties packaged in cases and stored in a freezer until selected for delivery. The freezer's steel doors are ten feet high and eight inches thick. There is a four inch steel strip which holds weather stripping to the edge of the doors along the edge of each door. The steel strip is securely fastened to the doors with three inch screws which are placed approximately six inches apart.

On June 16, 1993, Seely was working the evening shift at Perlman. At 8:30 p.m., Pat Holloway, evening supervisor, discovered a twisted piece of the steel strip which holds the weather stripping to the freezer doors on his desk. Holloway knew that only two people, one of whom was Seely, were assigned to a position that evening which would have taken them in and out of the freezer, and he went to the loading dock to inquire about the piece of steel. Holloway first encountered the other person assigned to a freezer position that evening. That person told Holloway to ask Seely about the twisted piece of steel.

Holloway confronted Seely, and asked her whether she had hit the freezer door with her material handling equipment. Seely denied hitting the door with her equipment. When Holloway questioned her again, Seely claimed that the piece of steel had fallen off the door, and that she had placed it on Holloway's desk. Holloway asked Seely three times whether she had hit the door, and each time Seely denied hitting the door. Holloway then questioned a worker assigned to the cooler, a room connected to the freezer by way of the doors in question. That worker stated that he heard someone hit the door, looked around and saw Seely at the door. Two additional workers in the building reported hearing a loud collision, but they did not see anything. After questioning additional warehouse workers, Holloway telephoned Ralph Haggerty, Director of Operations, at home. Haggerty told Holloway to document the facts, and that he would conduct a further investigation.

The next morning, Haggerty received the written report from Holloway. After receiving the report, Haggerty telephoned Holloway at home to review the incident. On June 22, 1993, Haggerty and Brian Beckham, another supervisor, met with Seely. At that meeting, Haggerty explained to Seely that Holloway had reported that she had hit the freezer doors. Haggerty asked Seely if she

had hit the freezer doors, and Seely responded that she had not. Haggerty then asked Seely if her material handling equipment had hit the freezer doors, and Seely responded that it had not. Haggerty asked Seely if the pallet she was transporting had hit the freezer doors, and Seely responded that it had not. Seely eventually stated that a case of red meat that she was transporting "might" have hit the freezer door. R. at 76. At the conclusion of the meeting, Haggerty told Seely that he would further investigate the incident, and that, at minimum, a warning letter would be placed in Seely's personnel file.

On July 8, 1993, Haggerty and Jill Malan, Perlman's Human Resources Administrator, met with Seely. According to Haggerty and Malan, Seely admitted that 1) she had hit the freezer door with a case of frozen beef patties, and 2) she had lied to Holloway by telling him that she did not hit the freezer door. According to Seely, she did not admit that she had lied to Holloway on June 16. The following day, Seely received a letter from Haggerty which stated, among other things, that any further false or misleading statements could lead to further disciplinary action, up to and including termination.[1]

On July 13, 1993, four days after receiving the letter, Seely contacted Peter Barickman, General Manager, and told him that she

1. The letter from Haggerty to Seely states as follows:

On June 16, 1993 your supervisor, Pat Holloway, had reason to believe the freezer doors had been hit and damaged by a piece of material handling equipment. Pat based this assumption on the fact that a piece of the door was on his desk. You were working in the area of the freezer doors. Pat asked you if you knew what had happened to the freezer doors. He asked you if you had hit the doors. You denied hitting the freezer doors and stated the metal strip had come off while you were passing by and you picked it up. Pat approached you again later that night and again you denied damaging the door.
I talked to you about the situation with Brian Beckham present. I asked you if you had hit the freezer doors. You stated that you had not. I then asked you if your piece of material handling equipment or the pallet you were transporting hit the door and you stated no. You stated a case of red meat that was on your pallet struck the door. On July 8, 1993, we discussed this situation in the presence of Jill Malan. You acknowledged

you had denied hitting the freezer doors to your supervisor, Pat Holloway. You acknowledged that when I asked if you hit the freezer doors, you stated no. You acknowledged that when I asked if your pallet hit the door you said no, but that a case of red meat hit the door.
The statements that you made to you supervisor, Pat Holloway and the statements that you made to me were false and misleading. You did hit the freezer door.
Your behavior in making false and misleading statements is unsatisfactory. Your concealment of an accident is unsatisfactory and is a continuation of previous inappropriate behavior....
Failure to fulfill your obligations as a Perlman–Rocque selector/loader, or the making of false or misleading statements, or concealment of an accident could lead to further disciplinary action, up to and including termination....
This letter should be viewed as a written warning and a copy of this letter will be placed in your personnel file.
R. at 107–08.

wanted to speak to him about the letter. During the meeting, Seely told Barickman that, on the evening of the accident, she had told Holloway that she had hit the freezer door with a case of red meat. Barickman told Seely that he needed to investigate the matter himself because he was not privy to any of the previous meetings. Barickman first discussed the matter with Holloway, who reported that he had asked Seely three times whether she had hit the door because he wanted to be very sure what had happened. Holloway told Barickman that Seely had denied hitting the freezer each of the three times that he had asked her. Barickman then talked to the worker who had heard the collision and seen Seely at the freezer doors. Barickman also spoke to two other workers who had heard the collision. They told Barickman that the collision had been much too loud to have come from a case of frozen meat. Barickman was aware that during the July 8, meeting with Haggerty and Malan, Seely had admitted lying to Holloway on June 16. Therefore, according to Barickman, Seely's statements to him that she had told Holloway she hit the freezer door with a case of red meat were false, misleading, and calculated to portray Holloway as untruthful.

Two days after the meeting with Barickman, Seely prepared a Guaranteed Fair Treatment Statement pursuant to Guaranteed Fair Treatment Procedure. Guaranteed Fair Treatment Procedure is a program which "guarantee[s] ... a fair and equitable process for the resolution of problems/complaints regarding promotions, discipline, compensation, or any other concerns of the employees." Guaranteed Fair Treatment Brochure, R. at 121. According to the brochure, employees follow three steps in resolving problems and complaints:

Step One—Discuss the concern with your supervisor in an open and frank manner. If you do not receive an answer you feel to be fair and equitable within seven (7) calendar days, you may proceed to Step Two within seven (7) calendar days of the decision.

Step Two—Develop a written outline of your concern and present it to your Supervisor. A meeting will then be arranged with your General Manager to discuss the concern, after which the General Manager will submit a written decision to you within seven (7) calendar days.... If, in good faith, you believe the decision is unfair, you may proceed to Step Three within seven (7) calendar days of the decision.

Step 3—If you believe that your concern still has not been resolved in a fair and equitable manner, you must request, in writing, a hearing of the complaint by the Appeals Board. Within thirty (30) days of your request, an Appeals Board ... will review the facts and circumstances surrounding the complaint. The Appeals Board may elect to 1) uphold the decision of management, or 2) overturn the decision of management. The decision of the Appeals Board is final and binding on the company and the employee....

R. at 121–22.

On Friday, July 16, 1993, Seely received a letter from Barickman stating that she was being terminated because of the false and misleading statements that she made to him on July 13.[2] Seely filed a claim for unem-

---

**2.** Barickman's letter to Seely states in pertinent part as follows:

On July 13, 1993, we ... had a conversation regarding your warning letter of July 9, 1993. During this conversation, you stated that you did tell Pat Holloway on the night of June 16, 1993, that you hit the freezer door with a case of 10/1 patties. I asked you to be sure that you were certain that you told Pat you had struck the door with product. You responded that you did tell Pat you had hit the door with the case of meat. I told you that I would speak to Pat Holloway that evening, July 13, 1993 and verify whether you told him that you had hit the door with product. You also stated that there were other witnesses. I told you I would talk to them as well.

As a result of those conversations, I ... have determined that what you have told me is not the truth. You did not tell Pat Holloway that evening that you hit the door, in fact, you denied any responsibility. Moreover, you not only denied this to Pat that evening, but also to Ralph Haggerty and Brian Beckham the following day. Additionally, eyewitness accounts indicated that you did hit the door, not with product, but with your walker.

Julie, despite repeated opportunities for you to be honest, you have continued your inappropriate behavior of making false and misleading

ployment compensation benefits, which Perlman disputed. On July 30, 1993, the Indiana Department of Employment and Training Services deputy in the Shelbyville office determined that Seely had been discharged for just cause. Seely appealed, and an administrative law judge heard evidence on September 9, 1993. The ALJ affirmed the deputy's decision that Seely had been discharged for just cause and was not entitled to unemployment benefits. Seely appealed to the Review Board. The Board reversed the ALJ's decision, and found that Seely was entitled to unemployment benefits. The Board's decision states in pertinent part as follows:

ISSUE: The issue before the Review Board is whether the Employer met its burden of proof to show that it discharged the claimant for just cause within the meaning of Ind.Code 22–4–15–1(d)(8).

FINDINGS OF FACT: The Review Board adopts and incorporates the findings of fact of the Administrative Law Judge except to the extent inconsistent with this decision or as modified herein.

The claimant worked six years as a loader in the Employer's meat warehouse. She was discharged for making false statements about an accident.

The incident that led to her discharge occurred on June 16, 1993 when she was loading cases of meat into a freezer.... [O]n July 9, 1993 [the Director of Operations] issued a disciplinary letter to her for making false and misleading statements and warning her that further false statements could lead to discharge.

The Claimant protested the warning letter to the general manager. The Claimant used the Employer's complaint procedure known as "Guaranteed Fair Treatment," or GFT. She told the general manager that she admitted to her supervisor that a case of frozen beef patties hit the door and that she had therefore never lied. The general manager and the director of operations did not believe the Claimant's statement that she had admitted the accident from the beginning. They concluded that

statements and attempts to discredit management of Perlman–Rocque, Greenfield. This will not be tolerated, therefore, your employment

she lied a second time when she protested to the general manager. They resolved that the effect of her protest was to accuse her supervisor of lying, since her supervisor stated that the Claimant denied hitting the door. They concluded that, in making her protest to the general manager, the Claimant made false and malicious statements about her supervisor. The Employer discharged the Claimant on July 16, 1993 for lying to the general manager about her supervisor.

Conclusions of Law—In a discharge case, the burden of proof is on the Employer to show that it discharged the Claimant for just cause.

In Mead Johnson & Co. v. Review Board (1984), Ind.App., 463 N.E.2d 537, 539, the Court held that when an employer imposes discipline on an employee for an incident of misconduct and that discipline is understood by the parties to settle the matter, the employer thereby waives its right to impose more severe discipline for the same incident at a later date. On July 9, 1993, the Employer issued a warning letter to the Claimant for making false statements to her supervisor and concealing an accident occurring on June 16, 1993. The July 9 warning was the final disciplinary disposition for the Claimant's alleged misconduct relating to the June 16, 1993 incident. The Employer could not discharge the Claimant for just cause for that incident.

The Claimant, however, protested the July 9 warning. She stuck to her story that she had not lied to her supervisor or concealed an accident. She resorted to the Employer's "Guaranteed Fair Treatment" procedures. In pursuing her protest, she reiterated the statements that she had made prior to the issuance of the warning.

The Employer contends that the Claimant's statements while pursuing the "Guaranteed Fair Treatment" procedure constitute new and separate incidents of making false and misleading statements. The Review Board finds, however, that pursuing a grievance through the Employer's griev-

with Perlman–Rocque, Greenfield is terminated effective today, Friday July 16, 1993.... R. at 106.

ance procedure cannot constitute a new and separate offense. An employee does not commit a new and separate offense by refusing to admit to the offense for which he/she has been disciplined.... An employer who creates a "Guaranteed Fair Treatment" or grievance procedure invites complaints and must accord an employee who resorts to the procedure a certain degree of privilege while utilizing its procedures. A reasonably prudent employee would not anticipate being discharged for filing a grievance and repeating the same version of an incident that was the basis for the disciplinary action against them. Although the Employer has attempted to characterize the Claimant's statements during the "Guaranteed Fair Treatment" procedure as a new offense, in fact, it discharged the Claimant for utilizing the procedure. Discharging the Claimant for utilizing the "Guaranteed Fair Treatment" procedures is not "fair treatment" and is not for just cause under the Act.

The Employer has not met its burden of proof. The Review Board finds that the Employer discharged the Claimant without just cause.

R. at 5–6.

Perlman now appeals the decision of the Review Board, arguing that the Board's decision is contrary to law.

### DECISION

#### I. Contrary to Law

When a Review Board decision is challenged as being contrary to law, our review is limited. Ind.Code 22–4–17–12 provides in pertinent part:

(a) Any decision of the review board shall be conclusive and binding as to all questions of fact....

(f) The appellant shall attach to the transcript an assignment of errors. An assignment of errors that the decision of the review board is contrary to law shall be sufficient to present both the sufficiency of the facts found to sustain the decision and the sufficiency of the evidence to sustain the findings of facts....

The statute causes a two-part inquiry. *Wampler v. Review Board* (1986), Ind.App., 498 N.E.2d 998, 1000. We first inquire into the nexus between the evidence presented and the findings of basic facts. *Id.* We determine whether the evidence justifies the Board's findings. *Id.* In this analysis, we do not reweigh the evidence. *Id.* We will consider evidence favorable to the Board's determination, and reasonable inferences to be drawn from it. *Id.* We next examine the relationship between the facts as found and the conclusions of the Board. *Id.* We determine whether the Board's deductions were reasonable, which is a question of law. *Id.*

In addition, the Review Board is not limited to the findings of fact or issues presented and decided by the appeals referee. *American Cablevision v. Review Board* (1988), Ind.App., 526 N.E.2d 240, 243. As the ultimate finder of fact, the Review Board has wide discretion and freedom to decide any and all issues, and may act independently on the evidence before it. *Id.*

Perlman argues that the Review Board's decision is contrary to law because 1) there is not a sufficient nexus between the evidence presented and the Board's findings of facts, and 2) the Board's conclusions are unreasonable.

#### A. Does the Evidence Justify the Board's Findings?

Perlman argues that there is no evidence to support the Board's finding that Seely was pursuing the Guaranteed Fair Treatment procedure when she met with Barickman. Specifically, Perlman argues as follows:

It would be impossible to conclude that the second statement made by the claimant was part of a grievance procedure, and not a new and separate offense, when the evidence very clearly and unequivocally shows that the grievance was not even prepared by the claimant until two days after the claimant's second statement was made.

Perlman's Brief, p. 10. We disagree.

It is irrelevant that Seely made the statement to Barickman before preparing her

written grievance because the evidence reveals that Perlman supervisors were aware that Seely was pursuing the grievance process. The notes taken during Seely's July 8, meeting with Haggerty and Malan, which were admitted into evidence at the hearing, provide as follows:

Julie Seely 7/8/93 3:55 p.m. Thurs.

Began discussing Peter's response to GFT. Julie said she would much rather handle them within our building.

R. at 118. There is a sufficient nexus between the evidence presented and the Board's finding that Seely's statement to Barickman was made while Seely was pursuing Guaranteed Fair Treatment procedure.

B. *Was the Board's Decision Reasonable?*

Perlman argues that it was unreasonable for the Board to conclude that Seely was discharged for utilizing Guaranteed Fair Treatment procedures. We disagree.

It is axiomatic that "an employee does not commit a new and separate offense by refusing to admit to the offense for which he/she has been disciplined," and that "a reasonably prudent employee would not anticipate being discharged for repeating the same version of an incident that was the basis for disciplinary action against them." Review Board's Conclusions of Law, R. at 6. Clearly, Seely's statements to Barickman, made pursuant to Guaranteed Fair Treatment procedure, were not a new offense. Accordingly, the Board's conclusion that Seely was discharged for uti-

lizing Guaranteed Fair Treatment procedure was reasonable.[3]

## II. *Due Process*

Perlman further argues that we should remand this case to the Review Board because Perlman's right to due process of law was violated. In support of its proposition, Perlman directs us to *Stanley v. Review Board* (1988), Ind.App., 528 N.E.2d 811, wherein this court found that Stanley's due process rights were violated when the Review Board reversed the ALJ based on a "paper review" of the proceedings below where the only issue to be decided was that of demeanor credibility.

Perlman's reliance on *Stanley* is misplaced. The sole issue to be decided in this case was not demeanor credibility. *See, Russell v. Review Board* (1992), Ind.App., 586 N.E.2d 942. Rather, the issue was whether Seely was pursuing Guaranteed Fair Treatment procedure when she was discharged. There was no due process violation in this case.

Affirmed.

CHEZEM and STATON, JJ., concur.

3. Because we affirm the Review Board based on Seely's invoking Guaranteed Fair Treatment procedures, we need not address Perlman's argument that the Board misinterpreted and misapplied *Mead Johnson & Co. v. Review Board* (1984), Ind.App., 463 N.E.2d 537. *See,* Review Board's Conclusions of Law, *supra.*