490 S.E.2d 823

## WEST VIRGINIA DIVISION OF ENVIRONMENTAL PROTECTION, Plaintiff Below, Appellant

v.

## KINGWOOD COAL COMPANY, Defendant Below, Appellee.

No. 23876.

Supreme Court of Appeals of West Virginia.

Submitted April 29, 1997.

Decided July 16, 1997.

---

Christopher D. Negley, Assistant Chief Office of Legal Services, West Virginia Division of Environmental Protection, Charleston, for Appellant.

Leonard Knee, Benjamin L. Bailey, Bowles Rice McDavid Graff & Love, P.L.L.C., Charleston, for Appellee.

Robert G. McLusky, James R. Snyder, Jackson & Kelly, Charleston, for Amicus Curiae West Virginia Coal Association and West

McHUGH, Justice:

This case is before this Court on an appeal by the West Virginia Division of Environmental Protection (hereinafter "DEP") of a May 24, 1996 order of the Circuit Court of Kanawha County, affirming an August 28, 1995 final order of the West Virginia Surface Mine Board. The issues in this appeal concern whether Kingwood Coal Company (hereinafter "Kingwood") "owned or controlled" T & T Fuels, Inc. (hereinafter "T & T") within the meaning of West Virginia's Surface Coal Mining and Reclamation Act, *W. Va.Code,* 22–3–1 *et seq.* (hereinafter "SCMRA"), and its corresponding rule, 38 C.S.R. 2–2.84(b)(6) (1996). For the reasons discussed herein, the circuit court's order is affirmed.

## I.

### *Factual and Procedural Background*

On or about December 15, 1971, T & T entered into a lease agreement with Kingwood Mining Company (hereinafter "KMC") which granted to T & T the exclusive mining rights to certain tracts of land in Preston County, West Virginia.[1] This lease agreement corresponds to the mine referred to as T & T Mine No. 2. Also on that date, the parties entered into a coal sales agreement in which KMC agreed to purchase T & T's entire production of coal from tracts leased from KMC.

On or about March 25, 1977, T & T and KMC amended the 1971 lease agreement to include the mineral rights to adjacent tracts of land for the mine referred to as T & T Mine No. 3. Also on that date, KMC and T & T entered into a new coal sales agreement, intended to supersede and replace the coal sales agreement previously entered into.

In 1990, KMC sold to Kingwood, the appellee herein, substantially all of its assets, including a preparation plant located in Albright, West Virginia, where the coal mined from Mine Nos. 2 and 3 was "washed" to make it saleable to KMC's customers. Kingwood also obtained the rights in the leases for Mine Nos. 2 and 3, as well as the coal sales agreements relative thereto.

In 1992, T & T completed coal removal in Mine No. 2 and, in 1993, coal removal in Mine No. 3 was likewise completed. Though T & T had installed a mine seal in Mine No. 2 in 1993, a blowout of acid mine drainage (hereinafter "amd") occurred at that mine in 1994, causing millions of gallons of amd to discharge into the Cheat River.[2] According to the DEP, it is currently spending $60,000 per month[3] to treat the amd discharged from the mines.[4]

Soon after, the DEP learned that Kingwood not only leased the mining rights to T & T but that it also had the exclusive right to receive the coal after mining. The DEP subsequently requested and obtained documentation from Kingwood which ultimately established the presumption that Kingwood owned or controlled Mine Nos. 2 and 3 under 38 C.S.R. 2–2.84(b)(6) (1996) of the SCMRA.[5]

1. KMC originally entered into the lease agreement with T & T Coals, Inc. The lease was subsequently assigned to T & T Fuels, Inc. T & T Coals, Inc. and T & T Fuels, Inc. are related companies ultimately owned by Paul and Lowell Thomas and are collectively referred to here as "T & T."

2. Though the mining activity at Mine Nos. 2 and 3 was conducted underground, the SCMRA regulates the surface impacts incident thereto, "including the drainage and discharge therefrom." *W. Va.Code,* 22–3–3(u)(1) [1994].

3. Treatment has heretofore been paid for by the special reclamation fund, which funds are expended by the director of the DEP for "the reclamation and rehabilitation of lands which

were subjected to permitted surface-mining operations and abandoned ... where the amount of the bond posted and forfeited on such land is less than the actual cost of reclamation." *W. Va. Code,* 22–3–11(g) [1994], in part.

4. In October 1995, T & T filed Chapter 7 (liquidation) bankruptcy.

5. The United States Department of Interior, through the Office of Surface Mining and Reclamation and Enforcement (hereinafter "OSM"), administers the federal Surface Mining Control and Reclamation Act, 30 U.S.C. § 1201 *et seq.,* and promulgates regulations including 38 C.S.R. 2–2.84(b)(6) (1996)'s federal counterpart, 30 C.F.R. § 773.5(b)(6) (1996). In that the former is identical to and derived from the latter, we

38 C.S.R. 2–2.84(b)(6) (1996) (hereinafter also referred to as "(b)(6)" or "(b)(6) presumption") provides:

> 2.84 Owned or Controlled and Owns or Controls—means any one or a combination of the relationships specified in paragraphs (a) and (b) of this definition:
>
> . . . .
>
> (b) The following relationships are *presumed to constitute ownership or control unless* a person can demonstrate that the person subject to the presumption does not in fact have the authority directly or indirectly to determine the manner in which the relevant surface mining operation is conducted:
>
> . . . .
>
> (6) Owning or controlling coal to be mined by another person under a lease, sublease or other contract and having the right to receive such coal after mining or having authority to determine the manner in which that person or another person conducts a surface mining operation.[6]

(emphasis and footnote added)

Also pursuant to (b)(6), Kingwood was advised that it would have the opportunity to rebut the presumption that it owned or controlled T & T. 38 C.S.R. 2–2.84(b)(6) (1996) [7] ("(b) The following relationships are presumed to constitute ownership or control *unless a person can demonstrate that the person subject to the presumption does not in fact have the authority directly or indirectly to determine the manner in which the relevant surface mining operation is conducted* [.]" *Id.* (emphasis added)). In an effort to do so, Kingwood submitted various documents, affidavits and arguments to the DEP [8]

---

give due consideration to the latter's regulatory history as well as to relevant federal case law in resolving the (b)(6) issues before us. *See State ex rel. McMahon v. Hamilton*, 198 W.Va. 575, 583 n. 14, 482 S.E.2d 192, 200 n. 14 (1996).

**6.** The (b)(6) presumption

> covers contract mining operations in which the person controlling the mining operation may be neither the permittee nor the operator, but instead is the owner or lessor of the coal. . . . In paragraph (b)(6) of the final definition of 'owned or controlled,' [OSM] has established a rebuttable presumption for 'captive' contractors of coal owners or lessors. . . . In situations covered by paragraph (b)(6), applicants would have to prove that a contract mining relationship with a coal lessor does not establish control. . . . [OSM] has adopted the presumption because, in contract mining operations, the owner or lessor of the coal more often than not is controlling the mining operation even though the owner or lessor of the coal purportedly employs 'independent contractors.'

53 Fed.Reg. 38876–77 (1988). *See generally United States v. Rapoca Energy Co.*, 613 F.Supp. 1161 (W.D.Va.1985).

**7.** "A primary purpose of establishing the presumption[ ] is to shift the burden of persuasion from the regulatory authority to the persons more likely to have access to the information necessary to establish whether control exists." 53 Fed.Reg. 38871 (1988).

**8.** The DEP enforces (b)(6), *supra*, as well as *W. Va.Code*, 22–3–18(c) [1994], which provides, *inter alia*:

> Where information available to the [DEP] indicates that any surface-mining operation owned or controlled by the applicant is currently in violation of this article or other environmental laws or rules, the permit shall not be issued until the applicant submits proof that such violation has been corrected or is in the process of being corrected to the satisfaction of the director or the department or agency which has jurisdiction over the violation. . . . Provided, That if the director finds that the applicant is or has been affiliated with, or managed or controlled by, or is or has been under the common control of, other than as an employee, a person who has had a surface-mining permit revoked or other security forfeited for failure to reclaim lands as required by the laws of this state, he or she shall not issue a permit to the applicant: Provided, however, That subject to the discretion of the director and based upon a petition for reinstatement, permits may be issued to any applicant if: (1) After revocation or forfeiture, the operator whose permit has been revoked or bond forfeited has paid into the special reclamation fund any additional sum of money determined by the director to be adequate to reclaim the disturbed area; (2) the violations which resulted in the revocation or forfeiture have not caused irreparable damage to the environment; and (3) the director is satisfied that the petitioner will comply with this article.

The federal OSM entered Kingwood into the Applicant/Violator System (AVS) apparently when T & T listed Kingwood on a coal reclamation fee report as mineral owner, purchaser and person to whom the coal was delivered. The AVS is "a computer system that identifies whether an applicant for a permit is linked by ownership or control to any person having outstanding

over a period of several months. *See* Discussion, *infra.*

The Director of the DEP issued a Final Agency Decision (hereinafter "DEP–FAD") on April 25, 1995, in which it was ultimately concluded, based upon the various documentation obtained from Kingwood, that KMC, whose assets were purchased by Kingwood in 1990, "not only had the authority to directly or indirectly determine the manner in which T & T conducted their underground mining, but KMC *did* directly control T & T's mining activity." (emphasis provided). In so concluding, the DEP–FAD referred to "memoranda between KMC employees, where the employees of KMC discuss which T & T mine should mine certain coal, where T & T should place their headings, whether or not to mine in existing headings, where to put the next panel, to stop mining in a certain area because of poor quality coal, etc." The DEP–FAD thus found that the evidence showed that "KMC was at the least highly involved [i]n determining where and how T & T would mine, this direction of T & T's activities by KMC is not evidence of the independent relationship advanced by [Kingwood] in their rebuttal."

The DEP–FAD further found there to be evidence that upon the sale of KMC's assets, Kingwood "intended to carry on, at least in terms of their relationship with T & T, where KMC left off. As has been shown, KMC exerted direct control of the activities of T & T relative to its deep mines." [9] (footnote added) The DEP–FAD found that the documents that governed KMC and T & T's relationship also governed Kingwood's relationship with T & T and "that there was *no change* through the transition to [Kingwood] in the management that was with KMC ... [Kingwood] certainly had the *authority* directly or indirectly to determine the manner and method of mining on the permits in question." (emphasis provided).

It was expressly stated in the DEP–FAD that the determinative element in evaluating the evidence submitted by Kingwood was not whether it actually exercised control over T & T, but whether it had the *authority* to exercise control. The DEP–FAD concluded that there were "many indicia of control present in T & T's relationship with KMC *and* [Kingwood], so DEP finds that [Kingwood] has not met its burden to prove by a preponderance of evidence that it lacked the

violations of federal or state surface mining laws." *Pittston Co. v. Lujan,* 798 F.Supp. 344, 345 (W.D.Va.1992) *aff'd,* 66 F.3d 714 (4th Cir. 1995), *cert. denied,* — U.S. —, 116 S.Ct. 1417, 134 L.Ed.2d 542 (1996). *See* 30 C.F.R. § 773.5 (1996). "OSM enters ownership or control links into the AVS, and this information bank is then used to evaluate permit applications or review whether current permits were improvidently issued. If linked on the AVS, an entity is said to be permit-blocked." *Arch Mineral Corp. v. Babbitt,* 104 F.3d 660, 664 (4th Cir.1997). *See* 53 Fed.Reg. 38868 (1988) ("This rule is intended to secure greater compliance with the [SCMRA] by preventing mining permits from being issued to persons who, either by themselves or through related persons, own or control violators of the [SCMRA].... In the past, some operators evaded the requirements of the [SCMRA] and obtained a new permit while past violations remained unabated or money remained unpaid. In some instances, they formed new corporations, partnerships or other business entities, and through them applied for permits for new operations without correcting the violations or paying the fees and penalties resulting from old operations. If allowed to persist, these practices could seriously weaken enforcement of the [SCMRA] and impede mine site reclamation. This could result in an unfair competitive advantage to op-

erators who fail to comply with the requirements of the law and thereby lower their coal production costs.")

When the amd discharge occurred at Mine No. 2 and T & T was found to be in violation of the SCMRA, the DEP conducted an investigation, including tapping into the AVS, to determine whether all persons owning or controlling T & T had been identified. During this investigation, Kingwood's name appeared and the DEP found that it owned or controlled T & T, thereby establishing the (b)(6) presumption.

9. For example, the DEP–FAD relied on a December 14, 1988 letter in which Jim Daugherty of KMC indicated to Chuck Watkins, Secretary of KMC and a lawyer involved in the impending sale of KMC's assets to Kingwood, that Paul Thomas of T & T was apprehensive "due to the 'possibility of [KMC] changing ownership'.... Mr. Thomas 'feels the present lease is OK if he is working with the same old KMC....'" In another letter to an attorney named Frank Gaffney, dated December 16, 1988, Mr. Watkins acknowledged " '[t]hat Mr. Thomas is concerned because of an impending sale of a majority of its [KMC's] stock. I can advise you that a condition of this sale is that there be *no change* in the current management of [KMC] as a result of the sale.' " (emphasis and brackets provided).

authority, directly or indirectly, to determine the manner in which T & T conducted the relevant surface mining operations." [10] (emphasis provided and footnote added).

Pursuant to 38 C.S.R. 2–2.84(b)(6) (1996), the DEP–FAD concluded that Kingwood was considered to be an owner or controller of T & T's mining operations in that Kingwood failed to demonstrate, by a preponderance of the evidence,[11] that it did *not* have the authority, directly or indirectly, to do so. As a result, the environmental violations relative to Mine Nos. 2 and 3 were to be linked to Kingwood and all of its owners and controllers through the AVS, *see* n. 8, *supra,* and Kingwood and all of its owners and controllers would be "blocked" from obtaining any new surface mining permits. *See* 53 Fed. Reg. 38871 (1988).

### Appeal to Surface Mine Board

Pursuant to *W.Va.Code,* 22–3–17(e) [1994], Kingwood filed a petition for appeal of the DEP–FAD with the Surface Mine Board (hereinafter "Board").[12] *See W. Va.Code,* 22B–4–1 [1994] ("Appointment and organization of surface mine board"). A ten-hour hearing on Kingwood's petition was conducted before the Board on July 17, 1995. In addition to the complete record considered by the DEP and the additional documents presented to it at the hearing, the Board heard the testimony of six fact witnesses and two expert witnesses on behalf of Kingwood, as well as the testimony of two fact witnesses on behalf of the DEP. The Board also asked questions of the parties' witnesses and of their counsel.

In a final order entered August 28, 1995, the Board reversed the DEP's Final Agency Decision, ultimately concluding that neither KMC nor Kingwood controlled T & T and further, that neither KMC nor Kingwood "has or had actual authority to determine the manner in which T & T conducts or conducted its mining operations." The Board made the following relevant findings of fact:

6. T & T was required under the lease and coal sales agreements to maintain its operations separate and independent of KMC or Kingwood. KMC and Kingwood did not have the right under the lease or the coal sales agreements to approve the mining plans or mine projections for the T & T mines. The only thing that T & T was required to provide to KMC or Kingwood under the lease was a copy of the six month progress maps for the mines.

7. T & T prepared all mining plans, permit applications, mine projections, health and safety plans, maps, and all other necessary documentation for the T & T mines. All permits for the T & T mines were in T & T's name. T & T did its own engineering work, or had it done by outside consultants. Kingwood did not do any engineering work for T & T. T & T paid all of its own bills, and Kingwood never loaned any money to T & T. Kingwood did not participate in regulatory inspections of the T & T mines, and Kingwood did not receive copies of inspection reports, notices of violation, cessation orders, or penalty assessments.

8. In 1990 John T. Clark, a Registered Professional Engineer, was hired by Kingwood as Chief Engineer. John Clark was employed by Kingwood from 1990 to 1994. During his employment by Kingwood, John Clark also did work for several local engineering consulting firms on his own

---

**10.** The DEP–FAD acknowledged Kingwood's position that the leases and contracts it entered into with T & T contained provisions indicating that Kingwood did *not* have the authority to control T & T. It further recognized Kingwood's argument that the documents submitted *lacked* provisions which commonly reflect the authority to control. Kingwood's arguments notwithstanding, the DEP–FAD indicated that "the fact remains that the documents do contain provisions that are indicative of control. These include provisions prohibiting T & T from assigning the lease without the approval of Kingwood and requiring T & T to comply with all applicable laws." The

DEP–FAD further made clear that, upon review of all of the evidence, "there is much more to the relationship than what is set forth in the documents."

**11.** "The measure of proof needed to rebut a presumption under this rule is a preponderance of the evidence[.]" 53 Fed.Reg. 38879 (1988).

**12.** Kingwood also filed with the Board a motion to stay the DEP–FAD pending the outcome of the appeal. By order entered June 24, 1995, the Board granted Kingwood's motion.

time. This practice is commonly known as moonlighting. As part of his moonlighting activities for a local engineering firm, John Clark sealed several mine maps for T & T. This was done by John Clark in his private capacity and was not done as an employee of Kingwood. John Clark did not prepare any maps, plans, or permit applications for T & T. The signing of T & T maps by John Clark was not done for or on behalf of Kingwood, and John Clark's signing of these mine maps for T & T did not give Kingwood any control over T & T.

9. Under the lease and coal sales agreement, Kingwood had the right to suggest matters dealing with protection of the reserves and quality of the coal. During active mining, KMC and Kingwood did on occasion make suggestions to T & T dealing with protection of the coal reserves and the quality of the coal. KMC and Kingwood occasionally requested that T & T take certain actions in order to protect the reserves or to improve the quality of the coal. However, Kingwood never demanded, nor did it have the right to demand, that T & T take any particular action with regard to the T & T mines. KMC's and Kingwood's requests were appropriate under the lease and coal sales agreements.

10. During the mining, T & T would from time to time seek the approval of KMC, and later Kingwood, to withdraw from an area of the mine or not to mine in the area. KMC and Kingwood would approve such requests. KMC and Kingwood were concerned that T & T obtain, as T & T was required to do under the lease, all of the minable and merchantable coal. When T & T withdrew from an area of the mine, any remaining coal would become difficult or impossible to mine. Thus, coal reserves would be lost. Kingwood and KMC's approval of T & T's requests to leave reserves was appropriate under the lease to protect the coal reserves.

11. T & T owned the coal when it was removed from the ground. The method of determining the price paid by KMC to T & T for the coal changed several times over the years. Kingwood paid a flat rate for the coal it bought from T & T. Regardless of how it was determined, the price paid to T & T was influenced by the ultimate market price received for the coal by either KMC or Kingwood.

12. Under the coal sales agreements KMC, and subsequently Kingwood, had the right to buy the coal produced by T & T from the mineral reserves leased to it by KMC. The 1977 coal sales agreement required T & T to sell to KMC and subsequently to Kingwood all of the coal mined by it from the mineral reserves it leased from KMC. Approximately fifteen percent of the coal mined in the T & T #3 mine was private mineral not leased from KMC or Kingwood. T & T was free to sell this coal to whomever it pleased. During one period in the mid to late 1980's, KMC could not take all of the coal produced by T & T, and KMC approved coal sales by T & T to third parties that amounted to about 400,000 tons. The 1977 coal sales agreement allowed T & T to make coal sales to third parties without approval by KMC or Kingwood if for any reason KMC or Kingwood could not buy all the coal produced by T & T for a forty-five day period.

13. The Board finds that T & T was not under the control of any other organization.

In addition, the Board made the following relevant conclusions of law:

2. [38 C.S.R. 2–2.84(b)(6) (1996)] creates the presumption of control if DEP can prove that Kingwood owned or controlled the coal mined by T & T and had the right to receive such coal. Alternatively, even without the presumption, DEP could prove that Kingwood had the authority to determine the manner in which T & T conducted its surface mining operation.

3. The DEP asserts in the FAD at page 18: 'The implied authority possessed by Kingwood over the operations conducted under the relevant permits cannot be lightly discounted.' However, [the Office of Surface Mining] describes the nature of the authority in question as 'actual,' as opposed to 'express' or 'implied' authority. 53 FR 38868, at 38870 and 38877, October 3, 1988.

4. In determining whether Kingwood had control over T & T, the test to be applied is the actual authority of Kingwood over the operations of T & T. 53 Federal Register 38868 at 38870 and 38877, October 3, 1988.

5. In this case no issue has been presented about any possible stock ownership relationship between T & T and either Kingwood or KMC.

6. The [Office of Surface Mining] and DEP regulations describe actual authority in terms of 'direct' and 'indirect' authority. Direct authority is that authority conferred by operation of law or by the creation of legally enforceable rights between the parties through mutually binding agreements.

7. In this case, Kingwood's ability to directly require T & T to act in the fashion that Kingwood wanted was limited by the lease and its amendments and the coal sales agreements between Kingwood and T & T. Kingwood did not have the right under the lease and the coal sales agreements to require T & T to conduct its operations as Kingwood directed. The lease and its first amendment and the coal sales agreements were entered into before the Surface Mining Act came into effect in 1977, and were between parties of sufficient resources and business experience as to be arms length transactions. Accordingly, Kingwood had no direct authority to control T & T.

8. Kingwood could not terminate either the lease or any of the coal sales agreement[s] arbitrarily or without reason. In this case Kingwood's inability to indirectly force T & T to comply with Kingwood's wishes was limited by the lease and coal sales agreements. T & T was able under the lease to take disputes to arbitration, and under the coal sales agreements it could litigate disputes. Kingwood had no unilateral right sufficient to force T & T to accede to Kingwood's wishes. For example, had Kingwood at any time . canceled the coal sales agreement, then the lease with T & T still would have been in effect and T & T could have sold the coal to third parties. Kingwood was and is unable to unilaterally impose sufficient consequences on T & T to force T & T to comply with Kingwood's wishes. Accordingly, Kingwood lacked sufficient indirect authority to control T & T.

9. The Board finds that Kingwood presented sufficient evidence to overcome any presumption of control created by the relationship between the parties. Since the Board is basing its ruling upon all the evidence, the Board does not accept or reject the other arguments advanced by Kingwood. The Board, for the purposes of this Decision, has considered the actions of both KMC and Kingwood in determining whether T & T was controlled by someone else.

10. A preponderance of the evidence establishes that Kingwood's activities under the lease were necessary and appropriate to protect the coal reserves and attempt to ensure maximum recovery of the reserve, and are not evidence of control.

11. A preponderance of the evidence establishes that Kingwood's activities under the coal sales agreements were proper to ensure that the coal could be processed to meet the quality requirements needed to fulfil its supply orders and are not evidence of control.

12. Kingwood has established by a preponderance of all of the evidence that T & T is not and was not under the control of either KMC or Kingwood. The preponderance of the evidence in the record establishes that regardless of whether the presumption does or does not exist, neither KMC nor Kingwood has or had actual authority to determine the manner in which T & T conducts or conducted its mining operations.

13. DEP acted unlawfully in issuing its Final Agency Decision of April 25, 1995, finding that Kingwood owned or controlled T & T.

The effect of the Board's decision was that of dissolving the ownership and control link between Kingwood and T & T.[13]

---

13. *See* 30 C.F.R. § 773.5 (1996) (Ownership or control link "means any relationship included in the definition of 'owned or controlled' or 'owns or controls' " in 30 C.F.R. § 773.5 (1996), which

II.

On September 26, 1995, the DEP filed a petition for appeal of the Board's final order in the Circuit Court of Kanawha County, pursuant to *W. Va.Code*, 22B–1–9 [1994] (general provisions for judicial review) and 29A–5–4 [1964] (judicial review of contested cases) of the State Administrative Procedures Act ("APA"). The circuit court heard arguments on the matter on May 15, 1996. At the hearing, counsel for the DEP contended that Kingwood failed to successfully rebut the presumption that it "owned or controlled" T & T's mining operations. 38 C.S.R. 2–2.84(b)(6) (1996).

After hearing arguments of counsel for both the DEP and Kingwood, the circuit court affirmed the Board's final order, concluding that the board's decision was not "clearly wrong." *See W. Va.Code*, 29A–5–4(g)(5) [1964]("(g) The court may affirm the order or decision of the agency or remand the case for further proceedings. It shall reverse, vacate or modify the order or decision of the agency if the substantial rights of the petitioner or petitioners have been prejudiced because the administrative findings, inferences, conclusions, decisions or order are:.... (5) Clearly wrong in view of the reliable, probative and substantial evidence on the whole record [.]"). The circuit court entered an order to this effect on May 24, 1996. It is from this order that the DEP now appeals.

The primary issue in this case is whether KMC or Kingwood "owned or controlled" T & T's mining operations relative to Mine Nos. 2 and 3. As stated earlier, determination of whether Kingwood "owned or controlled" T & T's mining operations is governed by 38 C.S.R. 2–2.84(b)(6) (1996),[14] *supra.*

The DEP raises several issues with regard to the (b)(6) presumption.[15] A threshold issue is whether the Surface Mine Board applied the proper standard of review when it considered the appeal of the DEP's Final Agency Decision, which decision had concluded that Kingwood owned or controlled T & T's mining operation within the meaning of (b)(6). The remaining issues relative to the (b)(6) presumption are as follows: (1) whether the Board improperly imposed on the DEP the burden of proving that Kingwood "actually" controlled T & T; and (2) whether the Board committed error in concluding that "[a] preponderance of the evidence establishes that Kingwood's activities under the lease were necessary and appropriate to protect the coal reserves and attempt to ensure maximum recovery of the reserve, and are not evidence of control[,]" and further, that "[a] preponderance of the evidence establishes that Kingwood's activities under the coal sales agreements were proper to ensure that the coal could be processed to meet the quality requirements needed to fulfill its supply orders and are not evidence of control."

---

is the federal counterpart to 38 C.S.R. 2–2.84 (1996)). *See also James Spur, Inc. v. OSMRE*, 12 OHA 133, 141–44 (1996).

**14.** A person may also be presumed to own or control an entity under five other presumptions set forth in 38 C.S.R. 2–2.84(b) (1996):

(1) Being an officer or director of an entity;

(2) Being the operator of a surface mining operation;

(3) Having the ability to commit the financial or real property assets or working resources of an entity;

(4) Being a general partner in a partnership;

(5) Based on the instruments of ownership or the voting securities of a corporate entity owning of record ten (10) through fifty (50) percent of the entity [.]

These presumptions are not at issue in this case.

**15.** We note that both the DEP and Kingwood acknowledge that the federal ownership and control rule, which includes 38 C.S.R. 2–2.84(b)(6) (1996)'s federal counterpart, 30 C.F.R. 773.5(b)(6) (1995), was found to be unlawful in *National Mining Ass'n. v. U.S. Dept. of Interior*, 105 F.3d 691 (D.C.Cir.1997). Both parties insist, however, that the validity of our state's (b)(6) presumption is not challenged in this case, was not raised below, and is not presently before this Court. We therefore will not address the issue in this appeal. *See* syl. pt. 3, *Voelker v. Frederick Business Properties*, 195 W.Va. 246, 465 S.E.2d 246 (1995) ("'In the exercise of its appellate jurisdiction, this Court will not decide nonjurisdictional questions which were not considered and decided by the court from which the appeal has been taken.'" (citations omitted)).

### A.

The first issue with regard to 38 C.S.R. 2–2.84(b)(6) (1996) is whether the Board employed the proper standard of review when it considered the appeal of the DEP's Final Agency Decision.

As stated above, the DEP–FAD concluded that Kingwood owned or controlled T & T's mining operations relative to Mine Nos. 2 and 3 within the meaning of (b)(6). Kingwood appealed the DEP–FAD to the Surface Mine Board in accordance with the provisions of *W. Va.Code*, 22B–1–7 [1994] ("Appeals to boards"). *See W. Va.Code*, 22B–1–7(b) [1994] ("Any person authorized by statute to seek review of an order ... of the ... director may appeal to the ... surface mine board ... in accordance with this section.")

■ The standard of review in such an appeal, though provided by statute, is ambiguous. Indeed, while there are two statutory provisions which purport to guide the Board's appellate review of a DEP–FAD, these provisions are inharmonious. It is therefore this Court's duty to construe them in order to effectuate the legislature's intent. As we held in syllabus point 2 of *Farley v. Buckalew*, 186 W.Va. 693, 414 S.E.2d 454 (1992), " '[t]he primary object in construing a statute is to ascertain and give effect to the intent of the Legislature.' Syllabus Point 1, *Smith v. State Workmen's Compensation Commissioner*, 159 W.Va. 108, 219 S.E.2d 361 (1975)."

*W. Va.Code*, 22B–1–7(e) [1994] provides that the appeal to the Board is to be heard *de novo*:

(e) Within fourteen days after receipt of a copy of the notice of appeal, the ... director ... shall prepare and certify to the board a complete record of the proceedings out of which the appeal arises including all documents and correspondence in the applicable files relating to the matter in question. With the consent of the board and upon such terms and conditions as the board may prescribe, any person affected by the matter pending before the board may by petition intervene as a

party appellant or appellee.... The board shall hear the appeal de novo, and evidence may be offered on behalf of the appellant, appellee and by any intervenors. The board may visit the site of the activity or proposed activity which is the subject of the hearing and take such additional evidence as it considers necessary [.]

*Id.*, in relevant part.

Under the above-quoted provision, not only does the Board consider "the complete record of the proceedings out of which the appeal arises including all documents and correspondence in the applicable files relating to the matter in question [,]" *id.*, but in addition, "evidence may be offered on behalf of the appellant, appellee and by any intervenors." [16] *Id.* (footnote added). Moreover, "the board may visit the site of the activity ... which is the subject of the hearing and take such additional evidence as it considers necessary." *Id.*

In contrast to the above provision requiring a *de novo* hearing on appeal to the Board, a second provision, *W. Va.Code*, 22B–1–7(g)(2) [1994] requires the board to affirm a DEP–FAD if it finds the decision to be "lawful and reasonable." *Id.* However, if the Board finds that such decision "was not supported by substantial evidence in the record considered as a whole," the Board is required to reverse or modify the DEP–FAD. *Id. W. Va.Code*, 22B–1–7(g)(2) [1994] states:

(g) After such hearing and consideration of all the testimony, evidence and record in the case:

. . . .

(2) The surface mine board shall make and enter a written order affirming the decision appealed from if the board finds that the decision was lawful and reasonable, or if the board finds that the decision was not supported by substantial evidence in the record considered as a whole, it shall make and enter a written order reversing or modifying the decision of the director.

■ Upon careful examination and comparison of these two standards of appellate review, we find that the Board properly con-

---

**16.** A party may intervene at the appeal stage "[w]ith the consent of the board and upon such terms and conditions as the board may prescribe[.]" *Id.*

ducted a *de novo* hearing of the appeal from the DEP–FAD, as such hearing was intended by the legislature. As stated above, *W. Va. Code*, 22B–1–7(e) [1994] *requires* that the Board hear appeals from a DEP–FAD *de novo. Id.* ("The board *shall* hear the appeal de novo [.]" (emphasis added)). The term "*de novo*" means " '[a]new; afresh; a second time.' " *Frymier–Halloran v. Paige*, 193 W.Va. 687, 693, 458 S.E.2d 780, 786 (1995) (*quoting Black's Law Dictionary* 435 (6th ed. 1990)). The term "hearing *de novo* " means "[g]enerally, a new hearing or a hearing for the second time, contemplating an entire trial in same manner in which matter was originally heard and a review of previous hearing. *Trying matter anew the same as if it had not been heard before and as if no decision had been previously rendered.* On hearing 'de novo' court hears matter as court of original and not appellate jurisdiction." *Black's Law Dictionary* 721 (6th ed.1990). (citations omitted and emphasis added).

As stated above, at a *de novo* hearing before the Board, it not only considers the complete record which was before the DEP, but it is also authorized to "take such additional evidence as it considers necessary[.]" *Id.* Moreover, a person who was *not* a party in the original proceeding before the DEP "may by petition intervene as a party" on appeal in the first instance. *Id.* The Board may also "visit the site of the activity ... which is the subject of the hearing [.]" *Id.*

Clearly, in authorizing the Board to try the case anew, the legislature intended that the Board be the ultimate finder of fact and to act independently on the evidence before it. *Perlman/Rocque v. Review Board*, 649 N.E.2d 701, 706 (Ind.Ct.App.1995). Indeed, *W. Va.Code*, 22B–1–7(i) [1994] requires that the Board's order "shall be accompanied by findings of fact and conclusions of law as specified in [*W. Va.Code*, 29A–5–3 of the Administrative Procedures Act.]" *Id.* Thus, in a *de novo* hearing, the Board "is not concerned with what took place below ... [a]s no presumption of correctness attaches to the action of the [DEP]." *Big Fork Mining Co. v. Tennessee Water Quality Control Bd.*, 620 S.W.2d 515, 521 (Tenn.Ct.App.1981). *See Linstad v. Sitka School Dist.*, 863 P.2d 838,

841 n. 8 (Alaska 1993) (*quoting* 2 Am.Jur.2d *Administrative Law* § 698, at 597 (1962)); *La Salle Partners, Inc. v. PTAB*, 269 Ill. App.3d 621, 207 Ill.Dec. 101, 105, 646 N.E.2d 935, 939, *appeal denied by* 163 Ill.2d 560, 212 Ill.Dec. 422, 657 N.E.2d 623 (1995); *Grasso v. Borough Council of Bor. of Glassboro*, 205 N.J.Super. 18, 500 A.2d 10, 14 (1985), *cert denied*, 103 N.J. 453, 511 A.2d 639 (1986); *Fall River County v. S.D. Dept. Of Rev.*, 552 N.W.2d 620, 624 (S.D.1996) ("De novo refers to a plenary form of review that affords no deference to the previous decisionmaker.").

Based on the above, we find the Board's statutory authority to hear *de novo* appeals from a DEP–FAD, *W. Va.Code*, 22B–1–7(e) [1994], authorizing it " 'to make an entirely independent determination, unencumbered by any presumptions regarding [the DEP–FAD],' " *Linstad*, 863 P.2d at 841 n. 8 (*quoting* 2 Am.Jur.2d *Administrative Law* § 698 at 598 (1962)), to be inharmonious with the language of *W. Va.Code*, 22B–1–7(g)(2) [1994], which requires the Board to affirm a DEP–FAD if it is "lawful and reasonable" unless the DEP–FAD "was not supported by substantial evidence in the record considered as a whole[,]" in which case, the Board must reverse or modify the DEP–FAD. *Id.* The deference *W. Va.Code*, 22B–1–7(g)(2) [1994] purportedly requires the Board to exercise in an appeal from a DEP–FAD contravenes the essential aspect of a hearing *de novo*—the reviewing entity's authority to exercise its independent judgment. *Linstad*, 863 P.2d at 841 n. 8.

We conclude therefore that appeals of a final agency decision issued by the director of the division of environmental protection shall be heard *de novo* by the surface mine board as required by *W.Va.Code*, 22B–1–7(e) [1994]. The board is not required to afford any deference to the DEP decision but shall act independently on the evidence before it.

The record in this case, which will be discussed in more detail below, clearly reflects that the Board conducted a *de novo* hearing and exercised its independent judgment on the evidence before it.

### B.

By order entered May 24, 1996, the circuit court, having reviewed the Board's final order pursuant to *W. Va.Code,* 29A–5–4(g)(5) [1964] of the APA,[17] and after hearing arguments on the matter, concluded that the Board's final order was not "clearly wrong."

In syllabus point 1 of *HCCRA v. Boone Memorial Hospital,* 196 W.Va. 326, 472 S.E.2d 411 (1996), we stated:

' "Upon judicial review of a contested case under the West Virginia Administrative Procedure[s] Act, Chapter 29A, Article 5, Section 4(g), the circuit court may affirm the order or decision of the agency or remand the case for further proceedings. The circuit court shall reverse, vacate or modify the order or decision of the agency if the substantial rights of the petitioner or petitioners have been prejudiced because the administrative findings, inferences, conclusions, decisions or order are '(1) In violation of constitutional or statutory provisions; or (2) In excess of the statutory authority or jurisdiction of the agency; or (3) Made upon unlawful procedures; or (4) Affected by other error of law; or (5) Clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.' " Syl. Pt. 2, *Shep-*

*herdstown Volunteer Fire Department v. Human Rights Commission,* 172 W.Va. 627, 309 S.E.2d 342 (1983).' Syllabus Point 1, *St. Mary's Hospital v. State Health Planning and Development Agency,* 178 W.Va. 792, 364 S.E.2d 805 (1987).

In that this Court reviews the circuit court's order *de novo,* we apply the same standard as did the circuit court. *HCCRA,* 196 W.Va. at 334–35, 472 S.E.2d at 419–20. Thus, we likewise review the Board's decision pursuant to the standard of review articulated in *W. Va.Code,* 29A–5–4(g) [1964], *supra,* and syllabus point 1 of *HCCRA, supra. See Kuitsarak Corp. v. Swope,* 870 P.2d 387, 392 (Alaska 1994); *Wacaser v. Insurance Com'r,* 321 Ark. 143, 900 S.W.2d 191, 193 (1995); *McClellan v. Meyer,* 900 P.2d 24, 29 (Colo. 1995); *Dolgner v. Alander,* 237 Conn. 272, 676 A.2d 865, 869 (1996); *Wood v. Superintendent of Insurance,* 638 A.2d 67, 70 (Me. 1994); *Montalvo v. Miss. State Bd. of Med. Lic.,* 671 So.2d 53, 55–56 (Miss.1996); *Dubray v. Coeur Rochester, Inc.,* 112 Nev. 332, 913 P.2d 1289, 1290 (1996) (" '[W]hen a decision of an administrative body is challenged, the function of [the Supreme Court of Nevada] is identical to that of the district court. It is to review the evidence presented to the administrative body and ascertain whether the body acted arbitrarily or capriciously, thus abusing its discretion.' " (citation omitted)). *Cf. Cox v. PSC,* 188 W.Va. 736, 426 S.E.2d 528 (1992).[18]

---

17. *W. Va.Code,* 29A–5–4(g) [1964] provides:

(g) The court may affirm the order or decision of the agency or remand the case for further proceedings. It shall reverse, vacate or modify the order or decision of the agency if the substantial rights of the petitioner or petitioners have been prejudiced because the administrative findings, inferences, conclusions, decision or order are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedures; or

(4) Affected by other error of law; or

(5) Clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or

(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

*See W. Va.Code,* 22B–1–9 [1994], "[g]eneral provisions for judicial review" (providing that *W.*

*Va.Code,* 29A–5–4 [1964] governs judicial review of order entered by Board after appeal hearing.).

18. In that this Court will review the circuit court's order *de novo* applying the same standard of review to the Board's decision as did the circuit court, *see W. Va.Code,* 29A–5–4(g) [1964], we need not address the DEP's contention that the circuit court committed reversible error by stating, without more, that the Board's findings of fact were not "clearly wrong" and its conclusions of law "not erroneous as a matter of law." *See HCCRA,* 196 W.Va. at 334–35, 472 S.E.2d at 419–20; *Matter of Permit No. 36–7200,* 121 Idaho 819, 828 P.2d 848, 851 (1992) ("Because this case is an appeal of an administrative determination, our inquiry is independent of the district court's appellate decision." (citations omitted)); *Carl Bolander & Sons v. City of Minneapolis,* 502 N.W.2d 203, 207 (Minn.1993) ("In reviewing actions by a governmental body, the focus is on the proceedings before the decision-making body ... not the findings of the trial court."); *Dubray,* 913 P.2d at 1290.

### III.

#### A.

The DEP argues that in order to successfully rebut the (b)(6) presumption, Kingwood was required to prove that it did not have the authority directly or indirectly to determine how T & T conducted its mining operations. 38 C.S.R. 2–2.84(b)(6) (1996). The issue before this Court is whether, contrary to the language of 38 C.S.R. 2–2.84(b)(6) (1996), the Board improperly imposed on the DEP the unreasonable burden of proving that Kingwood *actually controlled* T & T's mining operation.

The relevant language of 38 C.S.R. 2–2.84(b)(6) (1996) states:

2.84. Owned or Controlled and Owns or Controls—means any one or a combination of the relationships specified in paragraphs (a) and (b) of this definition:

. . . .

(b) The following relationships are presumed to constitute ownership or control unless a person can demonstrate that the person subject to the presumption does not in fact have the authority directly or indirectly to determine the manner in which the relevant surface mining operation is conducted:

. . . .

(6) Owning or controlling coal to be mined by another person under a lease, sublease or other contract and having the right to receive such coal after mining or having authority to determine the manner in which that person or another person conducts a surface mining operation.

In order to establish a presumption of ownership and control under 38 C.S.R. 2–2.84(b)(6) (1996), the DEP must show that a person owns or controls coal to be mined by another person under a lease, sublease or other contract and that such person either has the right to receive the coal after mining or has the authority to determine the manner in which the surface mining operation is conducted. *Id. See generally Pittston Co. v. Lujan,* 798 F.Supp. 344 (W.D.Va.1992), *aff'd,* 66 F.3d 714 (4th Cir.1995), *cert. denied,* ––– U.S. ––––, 116 S.Ct. 1417, 134 L.Ed.2d 542 (1996). The burden of persuasion then shifts

"to the persons more likely to have access to the information necessary to establish whether control exist." 53 Fed.Reg. 38871 (1988). *See* n. 7, *supra; Spur,* 12 OHA at 199. Thus, to rebut the (b)(6) presumption of ownership and control, the person subject to the presumption must demonstrate that it "does not in fact have the authority directly or indirectly to determine the manner in which the relevant surface mining operation is conducted[.]" 38 C.S.R. 2–2.84(b)(6) (1996). *See* 53 Fed.Reg. 38871 (1988) (The DEP does not "have easy access to the information which is needed to make an accurate determination of control … whereas persons subject to the presumption[ ] would have better access to the information needed to show control does not exist.") As previously indicated, the measure of proof required to rebut a(b)(6) presumption is a preponderance of the evidence. 53 Fed.Reg. 38879 (1988). *See* n. 11, *supra.*

To determine whether a person subject to a(b)(6) presumption has successfully rebutted it,

[OSM] will look to the actual relationship between the parties. Important factors to be considered in determining the actual relationship of the parties include whether the mining company is free to sell the coal it extracts to whenever [sic] it wishes and the degree of involvement of the coal owner or lessor in the mining operation. Information which can be used to rebut a presumption of control can include, but is not limited to, data on who provides engineering services, who determines the placement and method of driving entries or making cuts, and to whom the coal may be sold and at what price. As with all of the presumptions contained in the rule, submission of adequate information that is available to the parties involved will suffice to rebut the presumptions.

53 Fed.Reg. 38877 (1988).

Clearly, whether the person subject to the (b)(6) presumption successfully rebuts it by demonstrating that it in fact did not have authority directly or indirectly to determine the manner in which a mining operation is

conducted is a factual determination to be resolved on a case-by-case basis.

■ Thus, under 38 C.S.R. 2–2.84(b)(6) (1996), promulgated pursuant to the West Virginia Surface Coal Mining and Reclamation Act, *W. Va.Code*, 22–3–1 *et seq.*, owning or controlling coal to be mined by another person under a lease, sublease or other contract and having the right to receive such coal after mining or having authority to determine the manner in which that person or another person conducts a surface mining operation is presumed to constitute ownership or control. In order to rebut this presumption of ownership and control, the person subject to the presumption must demonstrate, by a preponderance of the evidence, that it does not in fact have the authority directly or indirectly to determine the manner in which the relevant surface mining operation is conducted. Whether a person has successfully rebutted a(b)(6) presumption is a factual determination to be resolved on a case-by-case basis.

In this case, the leases and coal sales agreements established the (b)(6) presumption because Kingwood owned or controlled the coal to be mined and had the right to receive it at its preparation plant located in Albright, West Virginia. It is the DEP's contention that the Board improperly placed on it the burden of also proving that Kingwood *actually controlled* T & T's mining operations. Relevant to the issue of what burden the Board imposed upon the parties are its following conclusions of law:

2. [38 C.S.R. 2–2.84(b)(6) (1996) ] creates the presumption of control if DEP can prove that Kingwood owned or controlled the coal mined by T & T and had the right to receive such coal. Alternatively, even without the presumption, DEP could prove that Kingwood had the authority to deter-

mine the manner in which T & T conducted its surface mining operation.

3. The DEP asserts in the FAD at page 18: 'The implied authority possessed by Kingwood over the operations conducted under the relevant permits cannot be lightly discounted.' However, OSM describes the nature of the authority in question as 'actual,' as opposed to 'express' or 'implied' authority. 53 FR 38868, at 38870 and 38877, October 3, 1988.

4. *In determining whether Kingwood had control over T & T, the test to be applied is the actual authority*[19] *of Kingwood over the operations of T & T.* 53 Federal Register 38868 at 38870 and 38877, October 3, 1988.

(emphasis and footnote added).

As Kingwood points out, and we believe correctly so, the Board in fact did not conclude that the DEP was required to prove that Kingwood *actually controlled* T & T's mining operations. Rather, in conclusion of law no. 4, the Board clearly stated that "[i]n determining *whether* Kingwood had *control* over T & T, *the test to be applied is the **actual authority** of Kingwood over the operations of T & T.* 53 Federal Register 38868 at 38870 and 38877, October 3, 1988." (emphasis added). Furthermore, in conclusion of law no. 12, the Board stated, *inter alia,* that "neither KMC or Kingwood has or had *actual authority* to determine the manner in which T & T conducts or conducted its mining operations." (emphasis added). We therefore find no merit in the DEP's contention that the Board required it to prove that Kingwood *actually controlled* T & T's mining operations.

### B.

During the July 17, 1995 *de novo* hearing before the Board, the DEP presented wit-

---

19. The use of the term "actual authority" was explained by the OSM as follows:

Actual Authority. As originally proposed, the rule would have defined 'control' as 'any relationship which gives one person *express or implied authority* to determine the manner in which that person or another person mines, handles, sells or disposes of coal …' [emphasis provided] *Some commentators stated that it was not clear what was meant by 'express or*

*implied authority.' They suggested that control should turn on 'actual' authority, as opposed to 'express or implied' authority. [OSM] agrees, and has not included the phrase 'expressed or implied' in the final definition. Paragraphs* (a)(3) and *(b) simply use the term 'authority,' which is intended to mean actual authority.* 53 Fed.Reg. 38870 (1988) (emphasis added). *See Spur,* 12 OHA at 181.

nesses and numerous documents to support the (b)(6) presumption that Kingwood owned or controlled T & T's mining operations. In an effort to demonstrate that it did not in fact have the actual authority directly or indirectly to determine the manner in which T & T conducted its mining operations so as to rebut the (b)(6) presumption, 38 C.S.R. 2–2.84(b)(6) (1996), or, in the alternative, to show that no (b)(6) presumption exists in this case, Kingwood also presented various witnesses and documents before the Board.

At the outset, we note that both the DEP and Kingwood agree that neither the leases, coal sales agreements nor any other legal document conferred *direct* authority on Kingwood to determine the manner in which T & T conducted its mining operations. The primary dispute among the parties is whether the evidence demonstrates that Kingwood had the authority *indirectly* to determine the manner in which T & T's mining operations were conducted.

As indicated above, this Court's review of the Board's August 28, 1995 order is limited, as we apply the standard of review enunciated in *W. Va.Code,* 29A–5–4(g) [1964] of the APA. *See* syl. pt. 1, *HCCRA, supra; id.,* 196 W.Va. at 334–35, 472 S.E.2d at 419–20 ("We review the circuit court's order *de novo,* applying the same 'clearly wrong' and 'arbitrary and capricious' standards as did the circuit court.") Our examination of the relevant evidence shall be conducted accordingly.

To support the (b)(6) presumption that Kingwood owned or controlled the manner in which T & T conducted its mining operations, the DEP presented a number of documents. For example, in a January 30, 1984 KMC internal memorandum, Dick Wilkinson, KMC's quality control manager at that time, wrote, in relevant part:

In observing the drilling at T & T on Beech Run, I believe in all the holes we hit that there were not any area that could not be mined. In all cases there were at least 4–6' of black shale over the seam and with the amount of water in the holes all the coal was washed away which indicates a fairly good grade of coal. I personally believe we have proven that T & T # 3 can get this coal. However, I would like to see

T & T # 2 work in this area until T & T # 3 starts in their direction.

According to the DEP, this memorandum is evidence that it was KMC that determined where T & T was to conduct its mining.

The DEP further points to a July 28, 1987 letter from James F. Daugherty, then President of KMC, to Junior Lose, Superintendent at Mine No. 2, in which Daugherty made an "official request" that T & T "stop mining in the vicinity of Station Number 2224 and move back to the vicinity of Station Number 2208. We are making this request because the coal quality is very bad … which is affecting our marketing capabilities." The DEP argues that this letter establishes that KMC actually exercised its authority over T & T by requiring it to stop mining in certain areas. Daugherty testified on behalf of Kingwood, however, that T & T refused to heed KMC's request to cease mining and, as a result, KMC was forced to purchase better quality coal to offset the poor quality coal T & T continued to mine.

The DEP presented another KMC internal memorandum, dated January 9, 1986, which discussed a drilling project on Mine No. 3. This memorandum, written by Wilkinson, stated in relevant part:

The drill holes shown in blue are the holes in our current drilling project. They show the coal to be very faulty and I have sketched the approximate fault line on the map in red. The red holes indicate the previous drilling project. The green holes indicate the proposed drilling holes if you elect to drill again, which at that time we would need another meeting with Mr. Thomas to get his approval.

The headings outlined in red indicate where we have decided to put the next panel. If we can get out on this panel we will turn to the left and try to go as far as we can. I am convinced that the coal in the point is faulty from what we have drilled and not mineable. I don't think there is a need to drill the holes marked in green at this time. If the miner cannot go in this next panel then we may need to check the other panels out later.

Notwithstanding the express statement that KMC would require the approval of T & T's owner in the event the parties wish to recommence drilling, the DEP maintains that the above memorandum is evidence that KMC exercised its actual authority over T & T's mining operation indicating how the mining should be conducted.

The DEP additionally presented to the Board an October 13, 1983 letter from Henry F. Ghezzi, Vice President and General Manager of KMC, to T & T, in which KMC granted Mine No. 2 "permission to dump any and all pond drippings, rejects and slurry at the [KMC] reject site [.]" According to the DEP, the fact that T & T paid no fee for its use of KMC's reject site is evidence that the parties' relationship was not that of lessor-lessee but rather, that of KMC controlling T & T's mining operations.

Kingwood argues, however, that should it, at any time, withdraw the permission it granted to T & T to dump its slurry and rejects on KMC's reject site, T & T would be forced to locate a site elsewhere. Moreover, Kingwood presented testimony that it also permits its lessors to dump their drippings and rejects on the site. Kingwood points out that, under the lease, T & T, upon request, was authorized to use KMC's facilities or land pertinent to its operations thereunder. The lease provided that T & T pay a 5% royalty to compensate KMC, and later Kingwood, for the rights conveyed to T & T under the lease, including the right to use KMC's facilities or land. However, according to the DEP, the reject site was apparently located on land which was adjacent to the mines but which was not leased to T & T.

As further evidence of Kingwood's control of T & T, the DEP presented a March 5, 1975 letter from Monongahela Power Company to KMC indicating that KMC had "offered to guarantee power company's revenue requirement contracts with" T & T. In response to this evidence, Kingwood pointed out at the hearing before the Board that not only was the 1975 letter dated four years after mining had already begun, but also that

there was no evidence that Kingwood did in fact guarantee the revenue requirements contract.

Additional evidence presented by the DEP included the fact that Kingwood and T & T's relationship continued for eighteen months after the 1971 lease expired. Though the parties eventually executed an addendum to the expired lease in 1981, extending it to 1991, "or upon exhaustion of the coal covered by said lease within said ten (10) year term," Gene Coccari, the DEP's manager of the ownership and control unit, Office of Mining and Reclamation, noted that the relationship continued without a written extension of the lease until mining was completed in 1993.

In an effort to demonstrate that it did not in fact have the actual authority directly or indirectly to determine the manner in which T & T conducted its mining operations, so as to rebut the (b)(6) presumption, 38 C.S.R. 2–2.84(b)(6) (1996), or in the alternative, to show that no (b)(6) presumption exists in this case, Kingwood presented, including the evidence discussed above, six fact witnesses and two expert witnesses, as well as various documents.

Michael Timothy Bostonia, controller and vice president of finance administration for the T & T group of companies[20] testified before the Board that Kingwood and T & T enjoyed a business relationship, the terms of which were defined by the leases and coal sales agreements in place at the time. He further testified that T & T's mines were profitable, that T & T was financially independent of Kingwood and that no one from either KMC or Kingwood had ever reviewed T & T's financial statements. Bostonia stated that upon the sale of KMC's assets to Kingwood in 1990, Kingwood proposed that T & T become a contract miner but that T & T refused to agree to a change in the parties' relationship.

John Clark, employed as Kingwood's chief engineer, testified that although he had signed maps for T & T while he was employed at Kingwood, he did so not as an

**20.** According to Bostonia, the Thomas brothers' interests in the coal industry comprised only a portion of their business concerns. Bostonia indicated that the T & T group of companies also included agriculture, insurance and banking interests.

employee of or on behalf of Kingwood, but as a "moonlighter," or consultant.[21] According to Clark, T & T paid him directly for his work. He further indicated that he had never been in Mine Nos. 2 and 3, that he never prepared any maps for T & T or any permit modifications or applications for them.

Similarly, Paul Chroussis, an engineer and surveyor who was not employed by Kingwood and who also occasionally worked for T & T as a consultant, testified that his engineering firm had arranged for Clark to work for T & T as a "moonlighter."[22] Chroussis testified that Clark never prepared the maps that he certified for T & T.

James F. Daugherty, Kingwood's vice president,[23] testified that neither KMC nor Kingwood ever participated in T & T's permitting activities, never prepared any maps for T & T, never paid its bills, taxes, T & T's state or federal reclamation fees or T & T's employees.

Dick Wilkinson, quality control manager for KMC and later Kingwood, testified that the lease executed by the parties provided for a right of arbitration which could be invoked by either Kingwood or T & T in the event of a dispute. The arbitration provision provided, in part, that "[a]ny controversy (other than [T & T's] failure to pay royalty herein provided for) between [KMC and later Kingwood] and [T & T] arising under this Lease shall be submitted to and determined by arbitration in the manner hereinafter set forth. The questions in dispute to be so determined shall be submitted by two arbitrators, one to be appointed by [KMC/Kingwood] and one by [T & T], and the two so chosen shall appoint a third arbitrator[.]" According to Kingwood, such a provision protecting T & T's interests would not have been necessary if Kingwood in fact controlled T & T. *Coteau Properties Co. v. Department of Interior*, 53 F.3d 1466, 1477 (8th Cir.1995).

Moreover, if Kingwood controlled T & T, their interests would not diverge. *Id.*

Wilkinson also explained why KMC and T & T had shared the costs of the drilling programs instituted to assist T & T in determining where to mine:

> Well, at this time the coal market was down quite a bit and the money was not as readily available and T & T felt that since [KMC] owned the reserves, we ought to do the drilling and [KMC] felt that since it was T & T's mine and dictated where they were going to mine, that they ought to do the drilling. So we compromised and split the cost of the drilling so that we could go ahead and do the drilling.

Wilkinson further explained that the costs of a second drilling program were shared because the Thomases, the owners of T & T, and two other parties, in addition to Kingwood, each owned a portion of the coal to be mined.

■ Kingwood also presented two expert witnesses during the hearing before the Board. Andrew Fox testified, over the DEP's objection, that from his review of the leases, the coal sales agreements, the DEP–FAD and the asset purchase agreement, the relationship between T & T and KMC/Kingwood was that of a typical lessor-lessee. He testified that the documents he reviewed conferred many rights on T & T not typically enjoyed by a contract miner. Fox further testified with regard to the fact that T & T performed its own lab analysis of the coal. He found this to be

> significant in that it shows that they had a vested interest in determining what the quality was, that they wanted to check to make sure that they were being paid the right amount of money for the coal that they were producing. It shows that they and Kingwood are not the same. If Kingwood and T & T were the same companies

---

**21.** Coccari of the DEP challenged Clark's testimony that he worked for T & T as an independent consultant and not in his capacity as a Kingwood employee. Coccari testified that if Clark did in fact work as a consultant for T & T then the documents he signed would have so indicated.

**22.** According to Chroussis, if Clark were not available to work for T & T, his firm would have arranged for another engineer to perform the work.

**23.** Daugherty indicated that he was originally hired at Kingwood as its general manager. At KMC, he served as its chief engineer, vice president, and ultimately, its president.

where one had control over the other, there would be no need to check the quality because they would be the same company.[24]

(footnote added).

As previously stated, this Court reviews the Board's decision under the standards set forth in *W. Va. Code*, 29A–5–4(g) [1964]. Our review therefore is limited to evaluating the record of the proceedings before it to determine whether there was evidence on the record to support its decision that Kingwood proved, by a preponderance of the evidence,[25] neither it nor KMC has or had actual authority to determine the manner in which T & T conducts or conducted its mining operations within the meaning of 38 C.S.R. 2–2.84(b)(6) (1996). *See Frank's Shoe Store v. Human Rights Com'n*, 179 W.Va. 53, 56, 365 S.E.2d 251, 254 (1986) (*citing Anderson v. City of Bessemer City*, 470 U.S. 564, 574–75, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518, 528 (1985)). We conduct our evaluation pursuant to the Board's findings of fact, "regardless of whether [this] [C]ourt would have reached a different conclusion on the same set of facts." *Id.*

■ Accordingly, we find that the Board, in concluding that Kingwood successfully demonstrated that it did not in fact have the authority to determine the manner in which T & T's mining operations were conducted,

thereby rebutting the (b)(6) presumption, addressed the relevant connections between the two companies. *Coteau*, 53 F.3d at 1477. Though Kingwood and T & T were connected through leases and coal sales agreements, the Board found that they were executed at arms length, *id;* conclusion of law no. 7, *supra*, and further, that the leases, which contained arbitration and default remedies, and the coal sales agreements, were designed to protect the interests of both parties. *Coteau*, 53 F.3d at 1477; findings of fact 1 and 2, *supra*. In that determination of ownership and control is a factual determination and is often unclear, *Coteau*, 53 F.3d at 1480, we cannot conclude, in light of the evidence presented before the Board and particularly, that which is recounted above, that the Board's decision was either "[c]learly wrong in view of the reliable, probative and substantial evidence on the whole record[,]" or "[a]rbitrary or capricious or characterized by abuse of discretion[.]" *W. Va. Code*, 29A–5–4(g)(5) and (6) [1964]. *See* syl. pt. 1, *HCCRA, supra.*

## IV.

The final issue with regard to the (b)(6) presumption concerns the DEP's contention that the Board committed error in concluding that "[a] preponderance of the evidence establishes that Kingwood's activities under the lease were necessary and appropriate to pro-

24. Kingwood's other expert witness, J. Steven Griles, former Deputy Assistant Secretary for the United States Department of Interior, Lands and Mineral Management, and author of the ownership and control definition set out in the federal regulations, explained the purpose of the Applicant/Violator System. The DEP objected to Mr. Griles' testimony below and argues on appeal that because 38 C.S.R. 2–2.84(b)(6) (1996) is clear and unambiguous, his interpretation of the (b)(6) presumption was inadmissible.

Our review of Griles' testimony reveals that he testified in the most general terms, essentially reiterating that which is found in 53 Fed.Reg. 38868 *et seq.* (authority on which the DEP relies) with regard to the rebuttable presumption and the term "actual authority." He further testified that the relationship between Kingwood and T & T was not the type of relationship that OSM contemplated when it wrote the (b)(6) presumption and that, therefore, the (b)(6) presumption did not exist in this case.

We conclude that if in fact the Board committed error in admitting Griles' brief testimony,

such error was harmless and does not warrant reversal of this case. *See generally* syl. pt. 4, *McAllister v. Weirton Hospital Co.*, 173 W.Va. 75, 312 S.E.2d 738 (1983). Though Griles testified that the relationship between the parties did not establish the (b)(6) presumption, significantly, the Board concluded otherwise. In conclusions of law 9 and 12, respectively, the Board stated: "Kingwood presented sufficient evidence to *overcome any presumption of control* created by the relationship between the parties[,]" and "regardless of whether the presumption does or does not exist, neither KMC or Kingwood has or had actual authority to determine the manner in which T & T conducts or conducted its mining operations." We find therefore that any error committed by the Board in admitting Griles' testimony, if it was error, was harmless.

25. *See Spur,* 12 OHA at 199 (" 'Evidence preponderates when it is more convincing to the trier of fact than the opposing evidence.' " (*quoting* 2 *McCormick on Evidence* 438 (4th ed.1992))).

tect the coal reserves and attempt to ensure maximum recovery of the reserve, and are not evidence of control[,]" and further, that "[a] preponderance of the evidence establishes that Kingwood's activities under the coal sales agreements were proper to ensure that the coal could be processed to meet the quality requirements needed to fulfill its supply orders and are not evidence of control." *See* conclusions of law no. 10 and 11, *supra.* In determining whether Kingwood successfully rebutted the (b)(6) presumption of ownership and control, the DEP argues that, under the language of 38 C.S.R. 2–2.84(b)(6) (1996), the Board should not have considered whether any of Kingwood's activities under the lease and coal sales agreement were "necessary, appropriate and proper." *See Id.*

The DEP's contention that the Board should not have considered whether any of Kingwood's activities were necessary and appropriate under the lease and coal sales agreement is derived from the case of *James Spur, Inc. v. OSMRE,* 12 OHA 133 (1996) and a United States Department of the Interior internal memorandum written thereafter, criticizing the *Spur* decision. In *Spur,* the Director of the Office of Hearings and Appeals ("OHA") of the Department of the Interior affirmed a decision of the Interior Board of Land Appeals ("IBLA") which dissolved an ownership and control link between an applicant and an operator with unabated violations of the SMCRA and outstanding unpaid civil penalties. Though a(b)(6) presumption of ownership and control was established in that case, the issue, as in this case, was whether Spur, the entity subject to the presumption, rebutted the presumption by demonstrating, by a preponderance of the evidence, that it did not have the authority directly or indirectly to determine the manner in which the surface mining operations were conducted. *Id.,* 12 OHA at 182.

The OHA in *Spur* affirmed the IBLA decision, thus concluding that Spur had successfully rebutted the (b)(6) presumption. The OHA rejected the OSM's argument that the IBLA had erroneously permitted Spur "to rebut the presumption of control by applying an improper 'legitimate purposes' test and by

allowing evidence of the purported intent of the parties to overcome the clear language of the contracts." *Id.* The IBLA had stated that it would " 'look to whether applicants have offered credible explanations demonstrating legitimate purposes (apart from an interest or intention to influence the conduct of operation) for elements of their relationship with the operator.' " *Id.* (*quoting* 133 IBLA at 187).

In a memorandum from John D. Leahy, Solicitor of the United States Department of the Interior, to Secretary of the Interior Bruce Babbitt, written soon after the *Spur* case was decided, the Solicitor criticized the *Spur* decision, considering the above-quoted reasoning to be flawed. The Solicitor

> concluded that a legitimate reason to exercise control is not an affirmative defense available to the permit applicant. The only necessary inquiry is whether the permit applicant had, in the language of the regulations implementing the statute, 'authority directly or indirectly to determine the manner in which the relevant surface coal mining operation is conducted.'

Memorandum, at p. 2 (*quoting* 30 C.F.R. § 773.5(b)(6)). Though the Solicitor believed that the outcome of the *Spur* case should not be disturbed, he indicated that "its reasoning should not be followed in future applications except to the extent consistent with the analysis provided [in the memorandum]." *Id.* at p. 1. The *Spur* decision was thus modified in part, to the extent that "[a] person's 'legitimate purposes' in having the ability to control a surface coal mining and reclamation operation do not rebut a presumption of control." *Id.* at p. 25.

Consistent with the Solicitor's Memorandum, discussed above, the DEP maintains that Kingwood's legitimate purposes in having the ability to control T & T's mining operations do not rebut the presumption of control established under 38 C.S.R. 2–2.84(b)(6) (1996). The DEP argues in this case that the Board committed error in concluding that a preponderance of the evidence establishes that Kingwood's activities under the lease and coal sales agreement are not evidence of control but were necessary and appropriate to protect the coal reserves, to

attempt to ensure maximum recovery of the reserve and to ensure that the coal could be processed to meet the quality requirements needed to fulfill its supply orders.

We need not decide whether the Board committed error in this regard. As previously set forth in this opinion, the Board was presented with an array of *other* evidence which it found supported its conclusion that Kingwood successfully rebutted the (b)(6) presumption in this case. *See, e.g.,* finding of fact no. 6 ("KMC and Kingwood did not have the right under the lease or the coal sales agreements to approve the mining plans or mine projections for the T & T mines."); finding of fact no. 7 ("T & T prepared all mining plans, permit applications, mine projections, health and safety plans, maps, and all other necessary documentation for the T & T mines. All permits for the T & T mines were in T & T's name. T & T did its own engineering work, or had it done by outside consultants. T & T paid all of its own bills, and Kingwood never loaned any money to T & T. Kingwood did not participate in regulatory inspections of the T & T mines, and Kingwood did not receive copies of inspection reports, notices of violation, cessation orders, or penalty assessments."); finding of fact no. 9 (though "Kingwood had the right to suggest matters dealing with protection of the reserves and quality of the coal" under the lease and coal sales agreement, and on occasion, did make suggestions in that regard, "Kingwood never demanded, nor did it have the right to demand, that T & T take any particular action with regard to the T & T mines."); finding of fact no. 11 (the price paid for the coal "was influenced by the ultimate market price received for the coal by either KMC or Kingwood."). *See also* finding of fact no. 12, *supra;* conclusions of law no. 7 and 8, *supra.*

In light of the evidence previously discussed in this opinion, and the Board's findings and conclusions, we cannot conclude that the Board's decision was either "[c]learly wrong in view of the reliable, probative and substantial evidence on the whole record[,]"

or "[a]rbitrary or capricious or characterized by abuse of discretion[.]" *W. Va.Code,* 29A–5–4(g)(5) and (6) [1964]. *See* syl. pt. 1, *HCCRA, supra.*

## V.

For the reasons discussed herein, the May 24, 1996 order of the Circuit Court of Kanawha County is hereby affirmed.[26]

Affirmed.

STARCHER, J., dissents and files a dissenting opinion.

STARCHER, Justice, dissenting:

I respectfully dissent. I would reverse the ruling below, and remand to the Surface Mine Board for consideration of important factual and legal issues regarding "control" that were not adequately addressed below. I also would require the Surface Mine Board to show the Department of Environmental Protection the deference the statute requires.

## I.

### Control

The pleadings and record indicate that the appellee Kingwood Coal is a subsidiary of a large national energy company, the Coastal Corporation. Kingwood Coal bought Kingwood Mining, a company which chose to acquire coal for the purpose of mining it, and selected a company (T & T) to carry out coal extraction. Kingwood Mining received, processed and sold almost all most of the coal as it was mined. Like the majority opinion, I would make the assumption that Kingwood Coal bought Kingwood Mining's liabilities and responsibilities, as well as its assets.

Now Kingwood Coal, a subsidiary of a large national corporation, disclaims any responsibility for the creation of what the pleadings indicate may be one of the worst long-term acid mine drainage sites created in this state since the passage of the Surface Mine Reclamation and Control Act twenty years ago.

Moreover, the pleadings indicate that because T & T Coal is bankrupt, the State of

---

26. Having affirmed the Board's decision that neither KMC nor Kingwood owned or controlled T & T's mining operations within the meaning of 38 C.S.R. 2–2.84(b)(6) (1996), we need not determine whether Kingwood was a successor-in-interest to KMC. *See generally Davis v. Celotex Corp.,* 187 W.Va. 566, 420 S.E.2d 557 (1992).

West Virginia is currently paying in the neighborhood of $60,000 per month to treat the acid mine drainage that is flowing from the mine void left by the mining of the coal.

I am concerned that our ruling may have the effect of shielding Kingwood Coal from long-term liability for the financial and environmental consequences of its chosen economic activity. This sort of immunity distorts the market, and unfairly penalizes coal operators and companies who do accept responsibility for the long-term effects of their economic activity.

I believe that the first issue in a control case should be the relevance of the control determination to the environmental law violation at issue. I think a that a fair and neutral test can and should be set out that would guide the control inquiry, and protect innocent coal owners but not immunize coal companies that are active partners in creating the problems that lead to the environmental law violations.

I believe that the Surface Mine Board should be required to address two key "control" issues: (1) what acts and decisions caused the creation of a long-term underground toxic spoil area that is polluting millions of gallons of groundwater discharge daily; and (2) who made those decisions?

The undisputed facts in the record strongly indicate that Kingwood actually made and thus "controlled" the only significant decision that resulted in the creation of this acid mine drainage site—the decision to extract the coal in the first instance. If the Board agreed with this impression, then Kingwood's responsibility for that decision should leave Kingwood permit-blocked, unless they abate the pollution.

The principle of responsibility by a mineral owner coal company was established in our law in *O'Dell v. McKenzie,* 150 W.Va. 346, 145 S.E.2d 388 (1965), where this Court held that a coal owner/lessor was jointly liable for water pollution damages where the lessor was a commercial coal company leasing coal.

Accordingly, I would reverse and remand to the Surface Mine Board.

## II.

### *Deference*

I also feel that we should not announce a new standard removing all deference to the agency (DEP) decision by the Surface Mine Board—particularly when, as the majority opinion clearly notes, our statutes contain clear language setting forth a deferential standard of review.

*W.Va.Code,* 22B–1–7 [1994] states that:

> (2) The surface mine board *shall* ... affirm[ ] ... the decision appealed from if the board finds that the decision was lawful and reasonable ... if the board finds that the decision *was not supported by substantial evidence in the record considered as a whole,* it shall make and enter a written order reversing or modifying the decision of the director. (emphasis added).

The classic "substantial evidence test," which is taught in every administrative law class, could not be set out more clearly. I am concerned that the majority opinion's failure to give due weight to this important principle of modern jurisprudence will undermine its significance in other contexts, beyond the area of appeals to the Surface Mine Board.[1]

How should we interpret the "hear de novo" language which the majority opinion accurately points to—language which is also contained in the same statutory section as the above-quoted "substantial evidence" standard?

---

1. The DEP is not represented by the Attorney General in this case, but by their own agency counsel, as is permitted by the statutes. This situation, in my opinion, can lead to problems. Important issues of what and how law applies to the State may be considered by this Court without the input and expertise of the State's chief legal officer, and without the consideration of the impact of decisions on these issues upon a wide variety of government agencies. *See, e.g., State ex rel. Smith v. Kermit Lumber,* 488 S.E.2d 901 (W.Va.1997) (holding that "personal action" statutes of limitation apply to the State; the State was represented in appeal by in-house counsel from DEP.) I think that one of the principal reasons that our founders established an Attorney General's office was to assure that important legal issues that will affect all state agencies had an advocate who is able to bring the expertise and breadth of government-wide representation before this Court, when we consider matters of overall importance to state government.

In my opinion, we are required to derive a standard that gives meaning to all of the legislative language. We should rule that, given the deferential "substantial evidence" standard of review language in our law, "hear *de novo*" means a procedural standard for the hearing, governing the receipt of evidence. That is, the record is developed in a hearing *de novo* (but the entire agency record below becomes part of the hearing record, along with all of the new evidence, testimony, etc.). This *de novo* procedural standard is wholly compatible with a deferential substantive standard for reviewing the decision below.

The majority opinion cites a number of cases from other jurisdictions for the proposition that to "hear *de novo*" means in all cases to give no deference in any regard to the decision below. But upon examination, none of those cases involved a situation where additional statutory language sets out a deferential standard of review.

When a statute provides for a deferential standard of review, a "*de novo*" hearing still means that deference is given to the decision below. A "*de novo*" hearing with deferential review is not incompatible. *See, Enservco, Inc. v. Indiana Securities Div.*, 623 N.E.2d 416, 420 (Ind.1993).

Practically speaking, under the new "no deference" standard set forth in the majority opinion, the institutional expertise and policies of the state's crucial environmental enforcement agency (for all of its limitations) is to be entitled to no weight and to mean nothing—upon review by a Board of part-time political appointees. It's not at all clear to me that this is what the Legislature intended. Accordingly, I dissent to this portion of the majority opinion as well.

### III.

#### When Will We Ever Learn?

Finally, I am reminded of a case in many ways similar to the instant case, whose facts arose in my home county, although the case itself came before the Circuit Court of Kanawha County. In *Four–H Road Comm. Assoc. v. Chief, Div. of Water Resources*, 177 W.Va. 643, 355 S.E.2d 624 (1987), this Court upheld a favorable mining permit decision by the Surface Mine Board, when a group of citizens, with expert support, had warned that the Omega mine would become a toxic acid mine drainage site for hundreds of years after mining. About five years after this Court's decision, what the citizens predicted turned out to be correct. At the Omega mine, the State of West Virginia is now treating the toxic drainage from the mine, at a cost of hundreds of thousands of dollars a year. We are now adding the T & T mine to the burden of State taxpayers and of coal companies who pay into the reclamation fund.

As I stated earlier in this dissent, I read our law as designed to be about requiring accountability for coal mining enterprises. To permit escape from accountability unfairly penalizes responsible businesses—here favoring large irresponsible out-of-state corporate interests over responsible State businesses. As a further result, the public fisc of our State is spent in toxic abatement—or alternatively, our communities, streams and mountains are fouled. I understand the majority opinion's approach to the issues in this case, but I disagree with it. Accordingly, I respectfully dissent.